# REDACTED VERSION

### In The Matter Of:
*Heather Nelson vs.*
*Santander Consumer USA, Inc., et al.*

*Deposition of RAYMOND NELSON*
*April 12, 2013*

## Verbatim Reporting, Limited

2 East Mifflin Street, Suite 102
Madison, WI  53703
(608) 255-7700  FAX (608) 255-7749



www. Verbatim-Madison.com

# REDACTED VERSION

Heather Nelson vs.
Santander Consumer USA, Inc., et al.

Deposition of RAYMOND NELSON
April 12, 2013

---

Deposition of RAYMOND NELSON 4-12-13

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - -

HEATHER NELSON,

        Plaintiff,

    -vs-                        Case No. 11-CV-307

SANTANDER CONSUMER USA, INC.,
PATRICK K. WILLIS CO., INC.,
d/b/a AMERICAN RECOVERY SERVICE,
ASSETSBIZ CORP., d/b/a ABC RECOVERY,

        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - -

Deposition of:

RAYMOND NELSON

Madison, Wisconsin
April 12, 2013

Reported by:  Lynn Schultz, RPR

---

Deposition of RAYMOND NELSON 4-12-13                    Page 3

1          DEPOSITION of RAYMOND NELSON, a witness of
2    lawful age, taken at the instance of the Defendants,
3    wherein Heather Nelson is the Plaintiff, and
4    Santander Consumer USA, Inc., et al., are the
5    Defendants, pending in the United States District
6    Court for the Western District of Wisconsin, pursuant
7    to subpoena, before Lynn Schultz, a Registered
8    Professional Reporter and Notary Public in and for
9    the State of Wisconsin, at the offices of Verbatim
10   Reporting, Limited, Two East Mifflin Street, Suite
11   102, City of Madison, County of Dane, and State of
12   Wisconsin, on the 12th day of April, 2013, commencing
13   at 9:56 in the forenoon.
14            A P P E A R A N C E S
15
16   MARY CATHERINE FONS, Attorney,
     FONS LAW OFFICE,
17          500 South Page Street, Stoughton, Wisconsin
            53589, appearing on behalf of the Plaintiff.
18          mfons@chorus.net  608-873-1270
19   IVAN HANNIBAL, Attorney,
     CONSUMER RIGHTS LAW OFFICE,
20          5908 Running Deer Trail, McFarland, Wisconsin
            53558, also appearing on behalf of the
21          Plaintiff.
            consumerrightslawoffice@gmail.com  608-852-6702
22   ROBERT O'MEARA, Attorney,
     REED SMITH, LLP,
23          10 South Wacker Drive, Chicago, Illinois
            60606-7507, appearing on behalf of the
24          Defendants.
            rcmeara@reedsmith.com  312-207-2441
25

---

Deposition of RAYMOND NELSON 4-12-13                    Page 2

1              I N D E X
2    WITNESS                              Page(s)
3    RAYMOND NELSON
4        Examination by Mr. O'Meara          4
5
6
7              E X H I B I T S
8    No.    Description              Identified
9    Exh 1    Monthly Verizon statement       32
10   Exh 2    Monthly Verizon statement       37
11
12
13
14   (Attached to the original transcript and copies
         provided to Mr. O'Meara and Ms. Fons)
15
16
17
18   (Original transcript filed with Mr. O'Meara and a
         copy provided to Ms. Fons)
19
20
21
22
23
24
25

---

Deposition of RAYMOND NELSON 4-12-13                    Page 4

1              RAYMOND NELSON,
2    called as a witness, being first duly sworn,
3    testified on oath as follows:
4              EXAMINATION
5    By Mr. O'Meara:
6    Q.  Good morning, Mr. Nelson.  My name is Robert
7        O'Meara.  I'm representing Santander.  Will you
8        please state your full name for the record,
9        please?
10   A.  Sure.  Raymond E. Nelson.
11   Q.  And have you ever been deposed before, Mr. Nelson?
12   A.  No.
13   Q.  Have you ever given testimony in any case before?
14   A.  No.
15   Q.  Your attorney's probably covered this with you,
16       but I'll briefly touch on some of the rules.  I
17       need you to answer verbally, no nods of the head.
18       The court reporter needs to take everything down.
19       You understand that?
20   A.  Yes.
21   Q.  Let me finish a question so the court reporter can
22       record that before you answer.  If you don't
23       understand a question, let me know.  I'll restate
24       it.  If you answer a question, I'll assume you
25       understood it.  Do you understand that?

---

1 A. Yes.
2 Q. And if you want to take a break for any reason,
3     just let us know, and we can take a break, okay?
4 A. Okay.
5 Q. Are you on any medication today that would impair
6     your ability to understand my questions or give
7     truthful answers?
8 A. No.
9 Q. Any other impairment that may affect your ability
10    to understand my questions or give truthful
11    answers?
12 A. No.
13 Q. Have you ever been a plaintiff in a lawsuit
14    before, Mr. Nelson?
15 A. No.
16 Q. Or a defendant in a lawsuit?
17 A. No.
18 Q. And you're represented today by counsel,
19    Mr. Hannibal and Ms. Fons?
20 A. Yes.
21 Q. What did you do to prepare for your deposition
22    today?
23 A. As far as just --
24 Q. Did you meet with anybody before your deposition?
25 A. Today?

1 Q. At any point.
2 A. Yes.
3 Q. I'm not going to ask you to give me any
4     conversations, but who did you meet with?
5 A. The lawyer, my lawyers.
6 Q. Both lawyers?
7 A. Yes.
8 Q. Was that yesterday?
9 A. This morning and -- briefly this morning.
10 Q. And --
11 A. And then Wednesday.
12 Q. Did you review any documents during your
13    preparation?
14 A. Just one.
15 Q. Do you recall what it was?
16 A. Yes.
17 Q. And what was it?
18 A. Just a document that had a signature on it.
19 Q. Which document was that?
20 A. It was -- trying to remember what it said. The
21    document was the -- where my name was on the loan
22    or not.
23 Q. Was anyone else present when you met with
24    Mr. Hannibal and Ms. Fons to prepare for your
25    deposition?

1 A. No.
2 Q. Did you talk to anybody about your deposition
3     other than Ms. Fons and Mr. Hannibal?
4 A. No.
5 Q. How old are you, Mr. Nelson?
6 A. Thirty-nine.
7 Q. And where do you live?
8 A. Sun Prairie, Wisconsin.
9 Q. Can you give me your address?
10 A. Sure.
11 Q. And how long have you lived there?
12 A. Approximately 11 years.
13 Q. And have you lived there continuously for those 11
14    years?
15 A. Yes.
16 Q. Are you married?
17 A. Yes.
18 Q. What's your wife's name?
19 A. Heather R. Nelson.
20 Q. And how long have you been married?
21 A. Going on 14 years.
22 Q. Do you have children?
23 A. Yes.
24 Q. How many children do you have?
25 A. Two.

1 Q. And what are their ages?
2 A. Twelve and ten.
3 Q. Boys or girls?
4 A. Boy and girl.
5 Q. The twelve-year-old?
6 A. Girl.
7 Q. And what's her name?
8 A. . . . .
9 Q. And your son's name?
10 A. .
11 Q. Did you graduate from high school, Mr. Nelson?
12 A. Yes.
13 Q. What year?
14 A. 1992.
15 Q. Any college after that?
16 A. No.
17 Q. Any vocational or technical training?
18 A. No.
19 Q. Do you have any other certifications or anything
20    else besides the high school diploma?
21 A. No.
22 Q. Can you briefly walk me through your employment
23    history following high school to the present?
24 A. Okay. After high school I worked for Munz
25    Corporation. That was for approximately two to

Heather Nelson vs.
Santander Consumer USA, Inc., et al.

Deposition of RAYMOND NELSON
April 12, 2013

Deposition of RAYMOND NELSON 4-12-13      Page 9

1     three years.
2 Q. What did you do for them?
3 A. Maintenance and grounds. And after that I did
4     Spartan Bowl for about three years. I was the
5     manager of the building. Then after that I worked
6     for Motion Industries.
7 Q. Motion Industries, how long did you work for them?
8 A. I want to say two to three years and was laid off
9     with that position.
10 Q. What did you do for them?
11 A. Warehouse. And then Edison Liquor Corp. Worked
12     there for like five years.
13 Q. What was your job at Edison Liquor Corp?
14 A. Delivery driver for them. And then current to the
15     position now I work with -- I should give you the
16     new name -- McKesson Corp. That's medical supply.
17 Q. How long have you worked for them?
18 A. Will be six years this year and -- yeah, six
19     years.
20 Q. And what do you do for them?
21 A. Delivery.
22 Q. Deliver medical supplies?
23 A. Yes.
24 Q. To other corporations or industries or to
25     individuals?

Deposition of RAYMOND NELSON 4-12-13      Page 10

1 A. It's nursing homes.
2 Q. Do you use any of your own vehicles for that
3     delivery or is that --
4 A. No.
5 Q. -- something that's provided by the employer?
6 A. Use vehicles supplied by the employer.
7 Q. So you don't use any of your personal vehicles to
8     deliver products on their behalf?
9 A. No.
10 Q. Does your wife work?
11 A. Yes.
12 Q. And where does she work?
13 A. Agrace Hospice Care.
14 Q. Is that a hospital or nursing home?
15 A. No. It's hard for me to explain. It's
16     basically -- it's -- she goes to different places
17     for people that's a little more ill and stuff, so
18     she kind of has, like, her areas.
19 Q. So she visits patients in their homes --
20 A. Yeah.
21 Q. -- who are ill and --
22 A. Homes or --
23 Q. -- need care?
24 A. -- assisted living centers.
25 Q. Is your wife a nurse?

Deposition of RAYMOND NELSON 4-12-13      Page 11

1 A. Yes.
2 Q. Do you know how long she's worked at Agrace
3     Hospice Care?
4 A. She took the position first of the year.
5 Q. Do you know where she worked before that?
6 A. Yes, Oakwood Village.
7 Q. What's Oakwood Village?
8 A. It's assisted living, you know, nursing center.
9 Q. Did she work as a nurse at Oakwood Village?
10 A. Yes.
11 Q. And how long was she there?
12 A. Give or take, a couple years. Not a hundred
13     percent sure.
14 Q. Do you know where she was employed before Oakwood
15     Village?
16 A. Yes, Care Wisconsin.
17 Q. And can you tell me what that is?
18 A. They have three different departments. Her
19     department was she was head of -- one of the heads
20     of the medication rooms where they get -- input
21     the prescriptions into the computer, and then
22     those get sent out to homes or people in assisted
23     living.
24 Q. Was she a nurse at the time that she was working
25     at Care Wisconsin?

Deposition of RAYMOND NELSON 4-12-13      Page 12

1 A. Yes.
2 Q. But she didn't see patients. It was more of a
3     prescription-based job?
4 A. Right, yeah. She didn't see patients, but she was
5     making sure people would get care, to send people
6     out or medications.
7 Q. Does your wife use any of your personal
8     automobiles for her work now to travel -- strike
9     that.
10        You said that she works for Agrace Hospice
11     Care now and that she visits patients at different
12     places. Does she travel there using one of your
13     personal vehicles or does she have a work-provided
14     car or other means of getting there?
15 A. She uses our vehicle to go to different places.
16 Q. Did she have -- was it part of her job at Oakwood
17     Village to visit different locations or different
18     patients in different locations?
19 A. No. She stayed at that building.
20 Q. So she would just drive to work and stay there?
21 A. Correct.
22 Q. How about at Care Wisconsin?
23 A. The same, just drive to work.
24 Q. And work at that building?
25 A. Correct.

Heather Nelson vs.
Santander Consumer USA, Inc., et al.

Deposition of RAYMOND NELSON
April 12, 2013

1 Q. Do you know where your wife was employed? You
2    sort of gave me a general couple of years back.
3    Do you know where she was employed in 2010? Would
4    that have been Care Wisconsin or Oakwood Village?
5 A. I think it was more or less -- I think it was Care
6    Wisconsin. Pretty sure Care Wisconsin.
7 Q. Let's talk about your vehicles now. Do you own
8    any automobiles or trucks or vans, any vehicle?
9 A. Personally me or just both of us?
10 Q. Start with what's ever comfortable, and I'll parse
11    it out.
12 A. We both -- I don't own any personally.
13 Q. Okay. Well, what family vehicles do you have that
14    you and your wife use?
15 A. We have a 2005 Chrysler Town & Country.
16 Q. And that's a minivan?
17 A. Correct. And then we have a 2004 Dodge Ram
18    pickup.                    ⟍
19 Q. Anything else? Any other cars or trucks or vans
20    or vehicles?
21 A. No.
22 Q. So if I refer to the 2004 Ram as your truck, you
23    will know what I'm referring to? If later in the
24    deposition I ask you questions about your truck,
25    do you understand that I'm referring to your 2004

1    Dodge Ram pickup truck?
2 A. Yes.
3 Q. And, similarly, if I just refer to the van, I'm
4    referring to the 2005 Town & Country minivan,
5    okay?
6 A. Yes.
7 Q. You mentioned you don't own any. Does that mean
8    that you didn't purchase these vehicles?
9 A. My name is just not on the titles.
10 Q. Is your name on the loans?
11 A. No.
12 Q. Whose name is on the loans?
13 A. Heather.
14 Q. And is there a loan for each of the cars? Each of
15    the cars were financed?
16 A. Yes.
17 Q. Who in your family typically uses which car?
18 A. Probably more or less she'll use the van. I'll
19    use the truck. Maybe she will 60 percent, but, I
20    mean, it varies sometimes.
21 Q. Now, you mentioned you weren't on the loan. Is
22    there a reason you weren't on the loan?
23 A. Not really.
24 Q. What's the current status of those loans, if you
25    know?

1 A. Not -- just where it is at now, I generally
2    don't --
3 Q. Well, let me ask it a -- maybe a better question.
4    Who makes the payments on any car loans, you or
5    your wife?
6 A. Heather does.
7 Q. Have you ever made any car payments?
8 A. Most part, no.
9 Q. What do you mean by the most part? Have you ever?
10 A. I just would give money sometimes, but I don't
11    know if it really went towards that.
12 Q. You'd give money to Heather?
13 A. Yes.
14 Q. So Heather would pay any payments on any car loan?
15 A. Correct.
16 Q. And that's for both the truck and the van?
17 A. Correct.
18 Q. Do you receive monthly statements? Do you know
19    whether or not you receive monthly statements to
20    your house regarding the car loans? I'm referring
21    to both.
22 A. Yes. I remember getting them, but I personally
23    don't open them.
24 Q. You don't open that mail?
25 A. No.

1 Q. Okay. Do you know if Heather's -- well, do you
2    know if you're still currently receiving loan
3    statements, monthly loan statements?
4 A. No, we're not.
5 Q. Do you know when they stopped arriving?
6 A. When? Approximate date, no, but more or less when
7    all this came.
8 Q. When the lawsuit --
9 A. When the lawsuit came forth, yes.
10 Q. So you haven't -- to your knowledge, you haven't
11    received any monthly loan statements since then?
12 A. I know for a fact we haven't.
13 Q. You have not?
14 A. Yes.
15 Q. I presume most of them, although you tell me if
16    I'm wrong, that Heather probably hasn't been
17    giving payments on the loans since the lawsuit
18    started.
19 A. Correct.
20 Q. Before the statements stopped coming and before
21    Heather stopped making any payments, do you know
22    how she paid, made the loan payments?
23 A. Not really. I know a few times she has done money
24    orders and stuff like that.
25 Q. Do you know whether or not she would mail a check

Heather Nelson vs.
Santander Consumer USA, Inc., et al.

Deposition of RAYMOND NELSON
April 12, 2013

Deposition of RAYMOND NELSON 4-12-13                      Page 17

1   in?
2 A. Not really.
3 Q. "Not really" you don't know or "not really" you
4   don't think she --
5 A. I don't really know.
6 Q. Do you and Heather have a joint checking account?
7 A. No.
8 Q. Do you have your own checking account?
9 A. Yes.
10 Q. Does Heather have her own checking account?
11 A. I'm not sure if she has one.
12 Q. You're not sure if your wife has a separate
13   checking account from you?
14 A. No.
15 Q. So it's possible she paid loan payments when they
16   were being paid with a check, but you just
17   don't -- you don't -- you just don't know?
18            MR. HANNIBAL: Objection, form,
19        foundation. Go ahead and answer, Ray.
20 A. She could have but not a hundred percent sure of
21   how she made it.
22 Q. Does she ever share with you how she made the
23   payments?
24 A. Just like I said before, just I seen a few
25   different money order payments and stuff.

Deposition of RAYMOND NELSON 4-12-13                      Page 18

1 Q. When you get a money order, is this -- can you
2   explain to me what you mean by a money order?
3 A. Just go to a place and have a money order for a
4   loan amount, and then she would send it off and
5   make sure it would get signed.
6 Q. And by send it off, you mean mail it in?
7 A. Yes.
8 Q. Did she ever make any payments via credit card?
9 A. No.
10 Q. Do you and Heather have a credit card together at
11   all?
12 A. No.
13 Q. Do you have your own credit card?
14 A. No.
15 Q. Does she have her own credit card?
16 A. No.
17 Q. Do you have a debit card?
18 A. Yes.
19 Q. And that's through your bank and your checking
20   account?
21 A. Correct.
22 Q. Does Heather have a debit card?
23 A. Yes.
24 Q. Does she have a copy of your debit card or does
25   she have her own separate debit card?

Deposition of RAYMOND NELSON 4-12-13                      Page 19

1 A. She has no copy of mine. She has her own.
2 Q. So it's not like a joint debit card account.
3   These are separate banks?
4 A. Correct.
5 Q. Is your debit card through the same bank where you
6   have your checking account?
7 A. Mine?
8 Q. Yes.
9 A. Yes.
10 Q. What bank is that?
11 A. Bank of Sun Prairie.
12 Q. Do you know where her debit card is issued by?
13 A. No.
14 Q. Is it the same bank?
15            MR. HANNIBAL: Objection, form,
16        foundation. Go ahead and answer, Ray.
17 A. No.
18 Q. How do you know?
19 A. I just -- I just know that she doesn't have that
20   bank.
21 Q. But you don't know what bank she does?
22 A. Correct.
23 Q. You just know it's not Sun Prairie?
24 A. Right.
25 Q. Do you know whether or not you need to have a

Deposition of RAYMOND NELSON 4-12-13                      Page 20

1   checking account in order to get a debit card?
2 A. Do I need a checking account to have a debit card?
3 Q. Yeah.
4 A. I would guess so.
5 Q. So you've never talked to your wife about her
6   debit card, correct?
7 A. Not really.
8 Q. Generally speaking, how do you and your wife
9   handle household bills?  Who pays what?
10 A. She pays the bills.
11 Q. Does she pay all of the bills?
12 A. Yes.
13 Q. We've talked about car loans.  Does that include a
14   home mortgage?
15 A. Yes.
16 Q. Utility bills, gas, electric, cable, that sort of
17   thing, she pays those as well?
18            MR. HANNIBAL: Objection, form,
19        foundation. Go ahead and answer, Ray.
20 A. Yes.
21 Q. Do you know how she pays any of these bills, in
22   what manner?
23 A. Just a few, like -- like gas and that I know
24   online.
25 Q. When you say "gas," you mean like natural gas?  Is

Heather Nelson vs.
Santander Consumer USA, Inc., et al.

Deposition of RAYMOND NELSON
April 12, 2013

1      that what you're referring to?
2  A.  Yeah.  Like some of those kind of type bills I
3      know she has done online before.
4  Q.  Have you ever paid any bills online before?
5  A.  Me personally?
6  Q.  Yeah.
7  A.  No.
8  Q.  Do you ever pay any of your own -- do you have any
9      of your own bills that Heather doesn't pay for
10     that you pay for yourself?
11 A.  No.
12 Q.  Have you ever paid a bill of any kind online?
13 A.  No.
14 Q.  Do you know what form of payment she uses when she
15     goes online to pay a bill?
16 A.  My guess would be maybe debit card.
17 Q.  Do you give Heather any money for your monthly
18     bills?
19 A.  Once in a while I'll just give her money, but I
20     don't know exactly where it's going to.
21 Q.  So she handles all of the financial bills and
22     payments in your house?
23 A.  Yes.
24 Q.  And how long has that been the case?
25 A.  Pretty much since we've been married.

1  Q.  Are there any bills that you handle on your own?
2  A.  No.
3  Q.  Does your mail come to your home address at
4  A.  My mail?
5  Q.  Your mail.
6  A.  Yes, yes.
7  Q.  So you get monthly bills, utility bills, gas
8      bills, or cable bills, any kind of utility bills
9      to your house at 5
10 A.  Yes.
11 Q.  Do you ever open or review any of the bills?
12 A.  Very rare.
13 Q.  On what occasion would you open or review a bill?
14 A.  Once in a while just open up, see how much it is,
15     put it in a pile, and she takes care of it.
16 Q.  Does she discuss with you what bills she's paying
17     and when?
18 A.  Sometimes.
19 Q.  But there's no monthly meeting to discuss --
20 A.  No.
21 Q.  -- bills and payments and whatnot?
22 A.  No.
23 Q.  Do any of your bills come electronically via
24     e-mail instead of via paper copy to your home?
25 A.  I'm not sure.

1  Q.  You're not aware of any?
2  A.  Right.
3  Q.  Do you have an e-mail address?
4  A.  Yes.
5  Q.  But you don't receive any bills at that e-mail?
6  A.  No.
7  Q.  Does Heather have an e-mail address?
8  A.  Yes.
9  Q.  Do you guys share log-in information such that she
10     can get into your e-mail or you can get into her
11     e-mail?
12 A.  No.
13 Q.  So you don't know whether or not she receives any
14     bills electronically to her e-mail address?
15 A.  Correct.
16 Q.  Do you own a cell phone, Mr. Nelson?
17 A.  Yes.
18 Q.  And what's your cell phone number?
19 A.
20 Q.  And does your wife have a cell phone?
21 A.  Yes.
22 Q.  What's her number?
23 A.
24 Q.  Do you own any other cell phones?
25 A.  No.

1  Q.  Are you responsible for any other cell phones?
2  A.  As far as work, stuff like that?
3  Q.  What I'm getting at is do you have an account with
4      any other cell phones or are you responsible for
5      the payment of any other cell phones?
6  A.  My kids have one.
7  Q.  And do you know their cell phone numbers?  Do each
8      of your children have a cell phone?
9  A.  Yes.
10 Q.  Do you know the number?
11 A.  Not off the top of my head.  It's in my phone.
12 Q.  Does the number                  sound familiar?
13 A.  Yes.
14 Q.  Is that one of your children's cell phones?
15 A.  Yeah.
16 Q.  Do you know if it's Autumn's or Austin's?
17 A.  I want to say that's my daughter's.  I'm bad with
18     numbers, remembering them.
19 Q.  What about                  do you recognize that
20     number?
21 A.  What was it again?
22 Q.
23 A.  I think -- I'm not hundred percent.  I think
24     that's my boy's.
25 Q.  What do you use your cell phone for?

Heather Nelson vs.
Santander Consumer USA, Inc., et al.

Deposition of RAYMOND NELSON
April 12, 2013

Deposition of RAYMOND NELSON 4-12-13
Page 25

1 A. Personal use.
2 Q. Is it required for work at all?
3 A. No.
4 Q. Have you ever used it for work?
5 A. No.
6 Q. What does Heather use her cell phone for?
7 A. Personal.
8 Q. And that's not -- she doesn't need that phone as
9    part of work?
10 A. No.
11 Q. Have you ever used your wife's cell phone?
12 A. No.
13 Q. Has she ever used yours?
14 A. No.
15 Q. Who's your cell phone carrier?
16 A. Verizon.
17 Q. And how long has Verizon been your cell phone
18    carrier?
19 A. I want to say 2008, 2007.
20 Q. Did you open that Verizon account?
21 A. Yes. My wife and I were both there when we opened
22    it.
23 Q. Do you know whose name the account's in?
24 A. Whose -- excuse me?
25 Q. Whose name is on the account?

Deposition of RAYMOND NELSON 4-12-13
Page 26

1 A. Mine.
2 Q. We're talking about your Verizon cell phone
3    account. Are all four of those numbers on that
4    same account?
5 A. Yes.
6 Q. And the account's in your name?
7 A. Yes.
8 Q. Do you know what sort of cell phone calling plan
9    you have on Verizon?
10 A. That I -- Heather's the one that does that.
11    There's different plans, and she makes sure that
12    we have recorded one for us.
13 Q. So other than opening up the account, you're not
14    involved in managing the account. Is that what
15    you're saying?
16 A. Correct.
17 Q. So you don't know what the monthly minutes are,
18    what the plan minutes are?
19 A. Not really.
20 Q. Do you know if you've ever gone over minutes?
21 A. As far as have we gone over minutes talking about
22    the plans or --
23 Q. Uh-huh.
24 A. -- like over-over?
25 Q. Have you ever exceeded your cell phone plan such

Deposition of RAYMOND NELSON 4-12-13
Page 27

1    that you've incurred charges for excess minutes?
2 A. No.
3 Q. No, you don't know or no, you don't think --
4 A. No, no.
5 Q. -- you've gone over?
6 A. Haven't went over.
7 Q. Haven't gone over the allotted minutes?
8 A. Correct.
9 Q. Who gets the cell phone bill, the Verizon bill?
10 A. Pretty much Heather opens it up pretty much.
11 Q. Is that a bill that you know comes to your home?
12 A. Yes.
13 Q. And does that come to your home monthly?
14 A. Yes.
15 Q. Is your name on that bill?
16 A. Yes.
17 Q. Is Heather's name on the bill?
18 A. No.
19 Q. Do you typically open the Verizon bill?
20 A. Once in a blue moon I'll open it up and look at
21    it.
22 Q. And you open it up just for curiosity because
23    you're not --
24 A. Just look at the amount. That's about as far as I
25    go.

Deposition of RAYMOND NELSON 4-12-13
Page 28

1 Q. We discussed bills generally but not the Verizon
2    bill specifically. Does Heather take care of the
3    payment on the Verizon bill as well?
4 A. Yes.
5 Q. Do you know how she pays the Verizon bill?
6 A. Not a hundred percent.
7 Q. Do you know whether or not she issues a check to
8    Verizon?
9 A. No.
10 Q. No, you don't know or no, she doesn't?
11 A. Don't know how.
12 Q. Do you give her money for the Verizon bill?
13 A. No.
14 Q. She just asks you for money sometimes if she -- I
15    don't know -- strike that. Does she sometimes ask
16    you to give her money for monthly bills?
17 A. No, that's not it. She just asks, "Can I
18    have a little bit of this," whatever, depending on
19    amount, and that's about it.
20 Q. She doesn't specifically identify what she needs
21    the money for. She just may approach you and say,
22    "Hey, I'm paying bills. I need $400" --
23    hypothetically -- "Can you give me $400 this
24    month?"
25 A. Correct.

Heather Nelson vs.
Santander Consumer USA, Inc., et al.

Deposition of RAYMOND NELSON
April 12, 2013

1 Q. Does she ever talk to you about your financial
2    situation, whether it's monthly bills, whether
3    they're behind or due or anything else like that?
4              MR. HANNIBAL: Objection, form,
5       foundation. You can go ahead and answer,
6       Ray.
7 A. General, no.
8 Q. Can you recall any specific instances that she's
9    done that?
10 A. No.
11 Q. Have you ever paid the Verizon bill ever?
12 A. Never.
13 Q. Are either you or your wife reimbursed for your
14    cell phone bill at all?
15 A. No.
16 Q. Never have been?
17              MR. HANNIBAL: Objection, asked and
18       answered. Go ahead and answer.
19 A. No.
20 Q. Do you have a landline at all, Mr. Nelson, at your
21    home?
22 A. No.
23 Q. So you and your wife just use your cell phones.
24    There's no home telephone line?
25 A. Correct.

1 Q. And how long has that been the case?
2 A. Gosh, few years, three years. I'm guessing. I'm
3    not a hundred percent.
4 Q. So you used to have a home landline?
5 A. Long -- awhile ago. I'm not exactly sure when we
6    got rid of it.
7 Q. Is there anything that would refresh your
8    recollection as to when you may have gotten rid of
9    your home telephone line?
10              MR. HANNIBAL: Objection, form,
11       foundation. Go ahead and answer, Ray.
12 A. No.
13 Q. Couple years ago is about the best you can recall?
14 A. Yeah, few years back, yeah.
15 Q. And why did you get rid of the landline?
16 A. Just felt like we didn't need it with the coverage
17    with cell phones now.
18 Q. So if you give out your telephone number to
19    anyone, are you giving out your cell phone number?
20 A. Just if I give it out, it's to friends, stuff like
21    that.
22 Q. Or work as the case may be. I presume work has
23    your cell phone number.
24 A. They have, but I have a company phone.
25 Q. You also have a company phone issued by them for

1    your work purposes?
2 A. Correct.
3 Q. If you give out your cell phone number to friends
4    or family, do you represent it as your home phone
5    number?
6 A. Just phone.
7 Q. So you don't --
8 A. Don't generalize it as, you know, this.
9 Q. You don't say, "Here's my home phone" or "Here's
10    my cell phone." You just say, "Here's my number"?
11 A. Correct.
12 Q. Do you know how Heather refers to her telephone
13    number when she gives it out to people?
14 A. Can't say. I'm not there. I don't --
15 Q. Have you ever heard Heather represent her cell
16    phone number as her home phone to somebody?
17 A. Don't recall.
18 Q. I only brought a couple of examples.
19              (Exhibit Nos. 1 and 2 are marked
20       for identification)
21 Q. Will you take a look at what's been marked as
22    Raymond Nelson Exhibit No. 1 and let me know if
23    you recognize that?
24              MR. HANNIBAL: You want him to look
25    at the whole thing?

1              MR. O'MEARA: As much as he's
2       comfortable looking through.
3 A. I just recall just these pages that we pretty much
4    get sent to us.
5 Q. Using the numbers -- use the numbers at the bottom
6    and let me know.
7 A. That one? (Indicating)
8 Q. Yeah.
9 A. The 0679, 0680 --
10 Q. Say through which number.
11 A. Oh, okay. Through 0683. These -- we don't get
12    these.
13 Q. Just to be clear, you're referring to the first
14    five pages of Exhibit 1. You recognize those as
15    being part of the monthly bills that come to your
16    home, but --
17 A. Yeah.
18 Q. -- the detailed calling records beyond that you
19    don't recall as being included in your regular
20    monthly Verizon bills; is that right?
21 A. Yeah. There are four pages with the blank. Yes,
22    those are the ones I recall or seen before.
23 Q. So you recognize this as Verizon's monthly bill to
24    you for cell phones, for your cell phones,
25    correct?

Heather Nelson vs.
Santander Consumer USA, Inc., et al.

Deposition of RAYMOND NELSON
April 12, 2013

Deposition of RAYMOND NELSON 4-12-13                    Page 33

1  A. Correct.
2  Q. And with the caveat that you've explained that you
3     don't get the detailed calling records that show
4     the numbers called and the times called, is this
5     the type of bill that is received by you monthly
6     from Verizon?
7             MR. HANNIBAL: Objection, form,
8     foundation. Go ahead and answer, Ray.
9  A. Yes. They just give you these kind of sheets in
10    the mail.
11 Q. If you turn to the second -- or, excuse me, to the
12    third page, which is Bates stamped 0681, under the
13    breakdown of charges, there's four telephone
14    numbers listed.
15        Is the first telephone number,        'hat's
16    your cell phone number?
17            MR. HANNIBAL: Objection, asked and
18    answered. Go ahead and answer, Ray.
19 A. \    is mine.
20 Q. And the second one, '    . think we said that was
21    your daughter's number?
22 A. My son's.
23 Q. Oh, that's your son's.        Heather's cell
24    phone?
25            MR. HANNIBAL: Objection, asked and

Deposition of RAYMOND NELSON 4-12-13                    Page 34

1     answered. Go ahead and answer, Ray.
2  A. Correct.
3  Q. And the last one is your daughter's cell phone
4     presumably, correct?
5  A. Correct.
6  Q. What's the number below that, the one that is
7     ...
8  A. I think that is a tablet, you know, the tablets,
9     because they have to have -- for them they have to
10    have, like, a number.
11 Q. Like an iPad or Kindle?
12 A. Yes. It's a tablet, like the iPads. They have to
13    have a general number, you know, for them.
14 Q. Like a data plan so that they are able to connect?
15 A. Yeah, I think so. Yeah, that's how they work
16    that.
17 Q. Who has a tablet in your family?
18 A. I got it for Heather.
19 Q. Mr. Nelson, you said you typically don't receive
20    the detailed calling records that show incoming
21    and outgoing calls.
22        Have you ever received that detail with any
23    of your monthly bills from Verizon?
24 A. No.
25 Q. If you look on the first page, quick bill summary,

Deposition of RAYMOND NELSON 4-12-13                    Page 35

1     it shows a previous balance of $611 and payments
2     of 455, leaving a balance of 156. Do you see
3     that?
4  A. Yes.
5  Q. Was it your wife's typical practice not to pay the
6     cell phone bill in full?
7  A. I don't know.
8  Q. Did you ever discuss with her her making partial
9     payments or paying less than the balance due on
10    the Verizon cell phone bill?
11 A. No.
12 Q. Did you ever discuss with her paying less than the
13    full balance due on any of your monthly bills?
14 A. As far as any just the cell phone in --
15 Q. Not cell phone. Any.
16 A. Have I had any discussions? No.
17 Q. So she's never told you, "I don't have enough
18    money to pay X, Y, Z bill, so I'm only going to
19    make a partial payment"?
20            MR. HANNIBAL: Objection, form,
21    foundation. Go ahead and answer, Ray.
22 A. No.
23 Q. Mr. Nelson, since you don't pay the bills, and it
24    sounds like you don't discuss the bills being paid
25    with Heather, would you have any way of knowing if

Deposition of RAYMOND NELSON 4-12-13                    Page 36

1     any of your home bills, whether they be mortgage,
2     cell phone, utilities, would be either overdue or
3     unpaid?
4  A. Eventually, probably.
5  Q. And why do you say that?
6  A. Just, I mean, if they -- depends how far it goes,
7     you know.
8  Q. So if it goes into collection and somebody calls
9     you, you might hear about it?
10 A. Possibly, yeah.
11 Q. But on a monthly basis, if a bill was partially
12    paid or wasn't paid for a month, that's not
13    necessarily something you would know about?
14 A. Generally, no.
15 Q. Heather wouldn't discuss that with you?
16 A. Not really.
17 Q. "Not really" --
18 A. No.
19 Q. -- meaning no or "not really" meaning sometimes?
20 A. No.
21 Q. Let me show you what's been marked as Exhibit No.
22    2. Do you recognize that, Mr. Nelson?
23            MR. HANNIBAL: Do you want him to
24    look at the whole exhibit?
25            MR. O'MEARA: Sure.

Heather Nelson vs.
Santander Consumer USA, Inc., et al.

Deposition of RAYMOND NELSON
April 12, 2013

Deposition of RAYMOND NELSON 4-12-13                Page 37

1 A. Just pages 0941 through 0945.
2 Q. And what do you recognize that as?
3 A. Monthly statement.
4 Q. And this is consistent with the type of monthly
5    statement you receive every month from Verizon?
6 A. The form, the way they do it, yes.
7 Q. How come Heather's name isn't on the Verizon
8    account?
9 A. My name is on it, but she is authorized to use it,
10   to have access to any of it.
11 Q. But why didn't her name -- strike that. I think
12   you mentioned that she was with you when you
13   opened this account, correct?
14 A. Correct.
15 Q. Was there a reason why her name wasn't on the bill
16   as well as yours?
17 A. No, just -- no.
18 Q. Just a choice?
19 A. Yeah. I just -- you know, we just put it in mine.
20 Q. Okay. I think we're done with it. You can move
21   that to the side. Let's talk about the lawsuit a
22   little bit now. You're aware of a lawsuit filed
23   by your wife Heather. That's the reason we're
24   here today?
25 A. Yes.

Deposition of RAYMOND NELSON 4-12-13                Page 38

1 Q. Have you seen a copy of the lawsuit that was
2    filed?
3 A. No.
4 Q. So you haven't seen a copy of the complaint?
5 A. No.
6 Q. You haven't read a copy of the complaint?
7 A. No.
8 Q. Have you talked to anybody about the lawsuit other
9    than your attorneys?
10 A. I don't recall saying anything.
11 Q. Friends? Family members?
12 A. No.
13 Q. No, you don't recall or --
14 A. No.
15 Q. -- no, you didn't talk about it with anybody?
16 A. I personally didn't say anything to anybody.
17 Q. Has anybody said anything to you about it?
18 A. Not that I recall. Somebody approached me with
19   it.
20 Q. No friends have asked you about the lawsuit?
21 A. Not that I -- no, no, not to my knowledge.
22 Q. Any family members ask about the lawsuit?
23 A. Personally they don't come and ask. Some -- I
24   mean, some have a whereabouts about it.
25 Q. Some family members are aware of a lawsuit. Is

Deposition of RAYMOND NELSON 4-12-13                Page 39

1    that what you're saying?
2 A. Yes.
3 Q. Do you know how they're aware of the lawsuit?
4 A. No.
5 Q. Have they had conversations with you about the
6    lawsuit?
7 A. No.
8 Q. How do you know they're aware of the lawsuit,
9    though?
10 A. Just being subpoenaed.
11 Q. Do you know what the lawsuit relates to?
12 A. Just what it's about?
13 Q. Yes.
14 A. Yeah.
15 Q. You do know what it's about?
16 A. Yes.
17 Q. Tell me in your own words what you understand it
18   to be about.
19 A. Just it's with the car loans, and really I don't
20   know all -- you know, the whole details about it.
21 Q. And I'm not asking you for all the details. I
22   just want to --
23 A. I just know it's with the car loan company
24   generally.
25 Q. And do you know what it relates to about the car

Deposition of RAYMOND NELSON 4-12-13                Page 40

1    loan company?
2 A. Not really.
3 Q. Do you know that it relates to telephone calls
4    allegedly made by the car loan company to your
5    wife?
6 A. I just have a little bit about it. I mean, that's
7    about as far as -- I don't know that it's, like, a
8    small issue or a big issue.
9 Q. I understand that. I'm just trying to get an idea
10   before I ask you some other questions what the
11   basis -- what your base understanding is.
12      When you refer to the car loan company, who
13   are you referring to?
14 A. Santander.
15 Q. Is it your understanding that Santander holds the
16   loans for the truck and the van?
17 A. Yes.
18 Q. And you're not on those loans; are you?
19 A. No.
20 Q. Have you ever seen those loan documents?
21 A. Oh, the loan -- the first loan documents?
22      MR. HANNIBAL: Interpose an
23      objection, form, foundation. Go ahead and
24      answer, Ray.
25 A. Not a hundred percent.

Heather Nelson vs.
Santander Consumer USA, Inc., et al.

Deposition of RAYMOND NELSON
April 12, 2013

Deposition of RAYMOND NELSON 4-12-13          Page 41

1  Q.  Do you know how long Santander has been the car
2      loan company for your truck and van loans?
3  A.  Not approximate sure how long, but I'm guessing
4      more than a few -- two, three years.
5  Q.  You're not sure, but that's what you think?
6  A.  Right.
7  Q.  Okay. Back to the lawsuit, do you understand that
8      part of the lawsuit relates to calls allegedly
9      made by Santander to Heather, telephone calls?
10 A.  Very little knowledge of it at the time, but now I
11     obviously know more about it.
12 Q.  When you say "at the time," what are you referring
13     to, at the time it was filed?
14 A.  No. Just I knew there was -- it could be part of
15     the -- the lawsuit.
16 Q.  Do you have an understanding whether or not any
17     repossessions or attempted repossessions could be
18     a part of the lawsuit?
19 A.  Yes.
20 Q.  And what's your understanding regarding that?
21 A.  Not -- I just know just it's part -- I mean, I
22     really don't know.
23 Q.  Do you know if Santander ever telephoned your
24     wife?
25 A.  Do I know that they called her phone?

Deposition of RAYMOND NELSON 4-12-13          Page 42

1  Q.  Uh-huh.
2  A.  Yes.
3  Q.  Do you know when those calls started?
4  A.  No, I do not know when they started.
5  Q.  Do you know if those calls ever stopped?
6  A.  When the lawsuit came about.
7  Q.  So when the lawsuit was filed, the telephone calls
8      from Santander stopped --
9  A.  Yes.
10 Q.  -- to your wife?
11 A.  Correct.
12 Q.  And you don't have a present understanding about
13     when they began?
14 A.  I don't know exact.
15 Q.  Do you know approximate?
16 A.  Year, date, you know, I don't know.
17 Q.  Do you have an approximate idea?
18 A.  No, I do not.
19 Q.  Do you know what the calls from Santander to
20     Heather were about?
21 A.  Not -- not a hundred -- not really, you know. I
22     personally -- I was -- I wasn't into that.
23 Q.  So Heather never told you why Santander was
24     calling her?
25 A.  Not -- not -- I guess more in the beginning, no,

Deposition of RAYMOND NELSON 4-12-13          Page 43

1      but towards the end, you know, middle, you know,
2      that they were supposedly saying for payment-wise.
3  Q.  So at some point in time Heather told you that she
4      was being called by Santander related to payments?
5  A.  Correct, and the only reason I know that is
6      because she had -- trying to gather proof of
7      payments.
8  Q.  So was Santander -- do you know whether or not
9      Santander was calling because they claimed that
10     payments were late?
11 A.  I couldn't say exactly why.
12 Q.  Did she ever tell you?
13 A.  No.
14 Q.  So you knew Santander was calling Heather for
15     something related to payment. Did you know
16     whether it related to the truck or the loan -- or,
17     excuse me, the truck or the van?
18 A.  I couldn't tell you either/or what it was about
19     or which one.
20 Q.  Did you know whether it was both?
21 A.  No.
22 Q.  Do you know how many calls Santander made to
23     Heather?
24 A.  I couldn't -- I know it was quite a bit.
25 Q.  Can you narrow that down?

Deposition of RAYMOND NELSON 4-12-13          Page 44

1  A.  I can't give you a figure. I can't really
2      determine a figure.
3  Q.  How do you know it was quite a bit?
4  A.  Just because she's had a call list or a log she
5      made.
6  Q.  So she maintained a call list of calls Santander
7      placed to her?
8  A.  Yes.
9  Q.  And did she show you a copy of that?
10 A.  No.
11 Q.  How did you see that?
12 A.  Just her list of it with her writing them down.
13 Q.  So you saw her while she was compiling the actual
14     list?
15 A.  I just knew she was -- you know, if they would
16     have called, that she would write it down, date,
17     time.
18 Q.  Did you observe her writing it down?
19 A.  From a distance, yes.
20 Q.  So is it something where she had a notepad where
21     she was keeping track of calls that came in?
22 A.  Pretty sure she had a notepad, yes.
23 Q.  And so you would see her writing down a call when
24     it came in?
25 A.  Right.

Heather Nelson vs.
Santander Consumer USA, Inc., et al.

Deposition of RAYMOND NELSON
April 12, 2013

1 Q. Did she talk to you about her list?
2 A. No.
3 Q. Did she tell you that it was a list of Santander
4    calls?
5 A. She didn't tell me specifically who it was for
6    just because she wasn't supposed to share the
7    information really.
8 Q. And did she tell you why she wasn't supposed to
9    share the information?
10 A. Just lawyer.
11 Q. Mr. Nelson, if she didn't tell you what the list
12    was for, are you positive, as you sit here today,
13    that the list you saw her making related to calls
14    from Santander?
15 A. She never told me, but you could figure it out
16    what it was for.
17 Q. Can you tell me how you could figure that out?
18 A. Just -- just from the -- you know, she'd receive a
19    call, and -- and, you know, done with the
20    conversation, she'd -- you know, she'd write the
21    name and stuff and just make a comment that, you
22    know, loan company. That's pretty much as far
23    as --
24 Q. So she might make a stray comment, "Oh, it was
25    just the loan company," and then you'd see her

1    reach for a pen?
2 A. Or -- right, or she would during the conversation
3    write the times, dates.
4 Q. Other than observing her writing down some notes
5    on a notepad, have you ever seen that notepad?
6 A. No.
7 Q. So you've never seen the list of calls she was
8    recording?
9 A. Like I said, she wasn't sharing that information.
10 Q. So other than quite a bit, do you have any other
11    approximation for how many calls Santander may
12    have made to Heather?
13 A. I can't give a straight figure. I really don't
14    know.
15 Q. Is there anything that would either refresh your
16    recollection or what would allow you to answer
17    that question?
18 A. No.
19 Q. Were you ever called by Santander?
20 A. I don't -- no. I don't believe so. I've never
21    spoke with anybody.
22 Q. Did you ever --
23 A. Not on my phone.
24 Q. And I'm talking about your phone.
25 A. Yeah. No, I haven't received a call.

1 Q. No voice mail messages?
2 A. No.
3 Q. So no calls from Santander. Did you ever call
4    Santander yourself?
5 A. No.
6 Q. Did you ever participate in any calls between
7    Heather and Santander?
8 A. I don't recall really.
9 Q. Did she ever give you the phone when Santander
10    called asking you to talk to them?
11 A. No.
12 Q. You were never on another line or conferenced in
13    with a conference call between Heather --
14 A. No.
15 Q. -- Santander and you?
16 A. No.
17 Q. So safe to say you've never had any conversations
18    with any representatives of Santander?
19 A. Right. No, I have not.
20 Q. Were you present when Heather was called by
21    Santander for any of these calls?
22 A. General area. It was in the house.
23 Q. So if she received a call in the house and you
24    were in the same room, that sort of thing?
25 A. Correct.

1 Q. Do you know where Heather also was when she
2    received the calls from Santander, generally
3    speaking? Was she at home? Was she at work? Do
4    you know where the majority of the calls were
5    placed?
6            MR. HANNIBAL: Objection, form,
7    foundation. Go ahead and answer, Ray.
8 A. Not really.
9 Q. Not really or no, you don't know?
10 A. I really don't know.
11 Q. Did you ever listen to any calls even if you
12    didn't participate in any with Heather? Did you
13    ever listen in to any?
14 A. Really didn't, you know, focus, listen-listen but,
15    I mean --
16 Q. Did she ever put any calls on speaker phone?
17 A. No.
18 Q. Did she ever play any -- well, strike that. Did
19    Santander ever leave her any messages, voice mail
20    messages, to your knowledge?
21 A. I believe so, maybe a few, if I recall.
22 Q. And why do you believe that to be the case?
23 A. Just because she's said she's had voice mails.
24 Q. So she may have mentioned to you that she had a
25    voice mail message from Santander?

Heather Nelson vs.
Santander Consumer USA, Inc., et al.

Deposition of RAYMOND NELSON
April 12, 2013

Deposition of RAYMOND NELSON 4-12-13                    Page 49

1  A. Just like general conversation, had a voice mail
2     from them.
3  Q. Did she ever tell you how many voice mails she had
4     from Santander?
5  A. No.
6  Q. Do you remember any specific conversations between
7     you and your wife regarding Santander voice mails
8     or just this general recollection that she's
9     mentioned it once or twice?
10 A. Just general.
11 Q. Did she say anything else about the voice mail
12    messages?
13 A. No.
14 Q. Did she tell you about the content of them?
15 A. No.
16 Q. Did she ever tell you about the content of any of
17    her telephone conversations, not voice mails at
18    this point, but conversations with Santander?
19 A. No, not really.
20 Q. "Not really" meaning no?
21 A. No.
22 Q. No?
23 A. No.
24 Q. So she never said, "I just got off the phone with
25    Santander, and they just said X, Y and Z to me"?

Deposition of RAYMOND NELSON 4-12-13                    Page 50

1  A. Just got off the phone but never explained about
2     what, about what it was about.
3  Q. So there was never any discussion regarding the
4     details of the conversation?
5  A. Correct.
6  Q. So would it be fair to say then that not only did
7     you never speak with Santander, you don't have any
8     basis for -- you don't have any knowledge of what
9     Santander may or may not have said to Heather
10    during those telephone calls; is that right?
11 A. No, I don't.
12 Q. Yes, I'm correct, or no, you don't?
13 A. Oh, I don't have any knowledge of it.
14 Q. So you didn't hear what Santander said to Heather,
15    correct?
16 A. Correct.
17 Q. And Heather never told you any details of what
18    Santander may or may not have said to her on the
19    phone, correct?
20 A. Correct.
21 Q. Did you ever listen to Heather's side of any
22    telephone calls with Santander?
23 A. Far as just conversating with them?
24 Q. Yes.
25 A. Generally just I wasn't focused on it, into it.

Deposition of RAYMOND NELSON 4-12-13                    Page 51

1     Just, I mean, background, you know, if I'm sitting
2     here in one room or living room watching TV or
3     something, you can obviously hear people on the
4     phone.
5  Q. But you wouldn't be paying attention to what's
6     being said?
7  A. No. I'm -- I'm -- I mean, I'm personally -- I
8     mean, I don't, you know, listen to her
9     conversations.
10 Q. So do you have any knowledge of what Heather may
11    have said to Santander during any of these
12    telephone conversations that you may have been
13    present for that she took?
14 A. No. I really don't know what she, you know,
15    simply said or, like I said, just general
16    background to what I was doing.
17 Q. Did you ever hear Heather verify her telephone
18    number during the call with Santander?
19 A. As far as verifying just --
20 Q. Did you ever hear her give Santander her telephone
21    number while she was on the call with them?
22 A. I've never heard her say that.
23 Q. Did you ever hear Heather give Santander
24    permission to call her on her cell phone during
25    any of these conversations?

Deposition of RAYMOND NELSON 4-12-13                    Page 52

1        MR. HANNIBAL: Objection, form,
2     foundation. Go ahead and answer, Ray.
3  A. I know for a fact that she's never gave her
4     permission.
5  Q. And how do you know that for a fact?
6  A. She has had a written letter.
7  Q. But you never heard her -- you never heard her
8     side of the conversation with Santander on any of
9     these telephone calls, correct?
10 A. I couldn't tell you exactly.
11 Q. Right.
12 A. No, just be like having a TV on in the background.
13 Q. So you have basically no recollection of any
14    details of any such conversations between Heather
15    and Santander?
16        MR. HANNIBAL: Objection, form,
17     foundation. Go ahead and answer, Ray.
18 A. Correct.
19 Q. Did you and Heather discuss the calls that
20    Santander was placing to her?
21 A. Not really. The only thing, like I said, is that
22    she had a letter that said not wanting them to
23    call her cell phone.
24 Q. And how did you know that?
25 A. She -- I've seen -- she showed me and sent it off.

Heather Nelson vs.
Santander Consumer USA, Inc., et al.

Deposition of RAYMOND NELSON
April 12, 2013

1  Q. She showed you the letter before she sent it?
2  A. Yes, but, I mean, just -- I generally looked over
3     and then she saying, you know, she -- that she
4     wrote it up herself and then sent it off to
5     Santander.
6  Q. Do you remember when this was?
7  A. I can't give you an approximate date.
8  Q. And why did she ask you to take a look at the
9     letter?
10 A. Just -- I really don't know. Just showed -- I
11    don't know. Just showed me.
12 Q. Did you have any comments to the letter?
13 A. Not really.
14 Q. "Not really" meaning no?
15 A. No, not really, no.
16 Q. Did Heather tell you why the letter was necessary
17    or why she wanted to send the letter?
18 A. Just didn't want to -- to my knowledge --
19 Q. I'm asking if she told you.
20 A. Oh, she told me?
21 Q. Did she give you a reason why she was --
22 A. Just didn't want calls to her cell phone but --
23             MR. HANNIBAL: Go ahead, I was just
24    going to say something else.
25 A. Oh, no.

1            MR. HANNIBAL: Whenever you have
2     the time, I could use a bathroom break.
3            MR. O'MEARA: Sure. We can do one
4     right now.
5            (A short break is taken)
6  Q. Mr. Nelson, we were discussing conversations
7     between you and your wife regarding calls from
8     Santander.
9     Approximately how many times did you and your
10    wife discuss telephone calls from Santander that
11    were placed to her?
12 A. I can't put a finger on it, but I know numerous
13    times. But I just knew that it was Santander, but
14    I don't know what it was about.
15 Q. You don't know what the calls were about?
16 A. Right.
17 Q. So she would mention that Santander had called,
18    but, again, you weren't privy to the contents of
19    the conversations?
20 A. She would mention Santander, you know, numerous
21    times but not all the time, just -- and the reason
22    why I say that is just because some of the
23    conversations that she would get pretty upset
24    with.
25    I mean, I could just see it in her face, and,

1     you know, being with her for so many years, I
2     just -- I mean, I know her.
3  Q. Well, when we just talked about this a little
4     while ago, Mr. Nelson, you said you didn't really
5     pay attention to any of her calls with Santander.
6     So are you saying now that you did listen to
7     her telephone calls with Santander?
8            MR. HANNIBAL: Objection,
9     mischaracterizes testimony. Go ahead and
10    answer, Ray.
11 A. I never said I listened to them. I just knew she
12    was on the phone with them.
13 Q. How would you know she was on the phone with
14    Santander and not somebody else?
15 A. For one, she had her pad, so I know she was
16    writing down numbers or time or date, whatever.
17    She was writing down on it.
18 Q. Do you know if she recorded every single call
19    Santander made to her?
20 A. Recorded as far as writing?
21 Q. Writing on her pad.
22 A. I would -- I would think -- not -- I don't know
23    every one. I don't know. I can't say for sure.
24 Q. So you don't know if she wrote down every one or
25    only some of the calls?

1  A. Right.
2  Q. Well, how did these calls affect Heather, if you
3     know?
4            MR. HANNIBAL: Objection, form,
5     foundation. Go ahead and answer, Ray.
6  A. Lots of different variances. I mean, like I said,
7     I didn't hear phone conversations.
8  Q. Did not?
9  A. I did not hear between her and Santander, but
10    there's numerous times that she would have tears
11    come down her face or -- and I had never
12    interjected on why it was going on and stuff.
13    And then -- and then I know she was just
14    upset because I could -- I just know, you know.
15    I've known her for so long. You can just read and
16    tell from someone, you know, that you know how
17    they're feeling.
18 Q. How many times did you see your wife in tears?
19 A. Numerous times.
20 Q. How many times?
21 A. I can't give a straight figure, just many times,
22    many numerous times. I mean, I can't say ten. I
23    can't say 300. I --
24 Q. You just don't know? Don't know?
25 A. Just don't know how many times, but I know it was

Heather Nelson vs.
Santander Consumer USA, Inc., et al.

Deposition of RAYMOND NELSON
April 12, 2013

1   numerous times because I didn't keep track.
2 Q. And how do you know that she was in tears because
3   of a telephone call with Santander and not
4   something else?
5 A. Like I said, I knew it was the loan company
6   Santander just because, you know, she was keeping
7   call logs because, you know, they, you know, were
8   calling quite a bit.
9 Q. When you saw her in tears, would you ask her what
10   was wrong?
11 A. I would ask her, but generally she wouldn't, you
12   know, come out because she tries to -- you know,
13   she doesn't want -- we have kids, and she
14   generally tries to keep the kids out of the adult
15   conversations and stuff like that so --
16 Q. So she didn't tell you what was wrong when you
17   saw --
18 A. No, not really. She really didn't go into detail.
19   She would just tell me that, you know -- you know,
20   just nonstop bugging her. That's about -- she
21   just was getting all these phone calls, and she
22   really didn't say exactly to me to point why they
23   were calling or this or that.
24 Q. Did you ever ask her why they were calling her?
25 A. Yeah.

1 Q. And when did you ask her that?
2 A. The only reason why I asked her at that point is
3   after when the truck got repo'd.
4 Q. So the first time that you asked her why Santander
5   was calling her was around the time the truck got
6   repossessed?
7 A. That's when I really started, you know, because,
8   like I said, I really didn't know what was going
9   on; but then after that, I mean, I knew something
10   was really going on.
11 Q. Did you ever ask your wife why Santander was
12   calling her?
13 A. No, not -- no.
14 Q. So you mentioned you saw your wife in tears
15   several times following what you believed to be
16   phone calls from Santander.
17       Any other way the telephone calls affected
18   your wife?
19       MR. HANNIBAL: Objection, form,
20   foundation. Go ahead and answer.
21 A. Any other ways that affected her?
22 Q. Uh-huh.
23 A. Or us?
24 Q. I'm asking about her right now. We'll talk
25   about --

1 A. Okay. Just -- it wasn't phone calls just itself.
2   She -- like I said, tears. She would -- she
3   didn't sleep a lot at night just because she's
4   fired up about -- upset about it, stuff like that.
5       And then as far as after the truck got repo'd
6   and we got it back, she's worried that these guys
7   would come back because she just felt they
8   wouldn't listen to her that she had everything in
9   order and stuff like that. So it put a strain on
10   her.
11 Q. Did she tell you it put a strain on her or is this
12   just what you observed?
13 A. One, I observed; and, two, she just said, "I can't
14   deal with it anymore."
15 Q. When did she say, "I can't deal with it anymore"?
16 A. I -- I couldn't tell you exact date.
17 Q. And what did she say about the strain she was
18   experiencing to you?
19 A. Just that she couldn't take it, you know, the
20   not -- she just -- basically just couldn't deal
21   with it no more.
22 Q. And what did you -- what did that mean? What did
23   you understand that to mean, "I can't deal with it
24   anymore"?
25 A. The way I would take it, just because they

1   wouldn't believe her or listen to her.
2 Q. What wouldn't they believe her about or listen to
3   her about?
4 A. Just that she -- that she would -- that, you know,
5   supposedly they're -- you know, obviously when you
6   get repo'd and you're late, that they didn't
7   believe her that she had up-to-date --
8 Q. So she was upset that she claimed that she was up
9   to date on payments, and Santander claimed that
10   she wasn't at the time of the repo?
11 A. Correct.
12 Q. And did you and Heather talk about that?
13 A. After the repo.
14 Q. I'm going to get to the repo in a little bit. You
15   mentioned in addition to tears and a strain on
16   her, that she had trouble sleeping.
17 A. Yes.
18 Q. For how long?
19 A. Quite awhile.
20 Q. For a week? A month? What's quite awhile?
21 A. I can't really put -- I mean, for a long time. I
22   mean, a lot -- probably well over a month, I mean,
23   weeks to a month, maybe a little more. I mean,
24   I'm not --
25 Q. Does she still have trouble sleeping?

Heather Nelson vs.
Santander Consumer USA, Inc., et al.

Deposition of RAYMOND NELSON
April 12, 2013

Deposition of RAYMOND NELSON 4-12-13          Page 61

1  A. No, not -- I wouldn't say she has a lot of trouble
2     sleeping, no.
3  Q. And when you say "trouble sleeping," does it mean
4     trouble falling asleep, getting up in the middle
5     of the night? What do you mean by "trouble
6     sleeping"?
7  A. Probably both.
8  Q. Did you talk to her about her trouble sleeping?
9  A. Very little.
10 Q. Do you remember any conversations with her about
11    it?
12 A. Not -- not to -- on exact point. It's just --
13    just -- you know, just I basically told her is
14    that you need -- I mean, "You have to sleep."
15 Q. Do you remember --
16 A. "It's not healthy." Sorry.
17 Q. No, I'm sorry for interrupting. Do you remember
18    when the time frame was when she had trouble
19    sleeping?
20 A. No. All -- I can't give you a specific date. I
21    just know, you know, the whole ordeal.
22 Q. And what do you mean by "the whole ordeal"?
23 A. The calls and where there's -- you know, her and
24    Santander going back and forth and then, you know,
25    obviously with that -- with the repo.

Deposition of RAYMOND NELSON 4-12-13          Page 62

1  Q. Any other way in which you observed Heather being
2     affected by these telephone calls other than what
3     you've mentioned?
4  A. Yeah. With her and I, yes.
5  Q. Okay. Tell me about that.
6  A. Well, it came down to a point where I personally
7     thought things were paying, because I travel a lot
8     for work. So when the repo come about, I
9     second-guessed her. That's when I really started
10    stepping in and going, "What's going on?"
11       You know, to me, my knowledge, you know, they
12    don't come for reasons -- that's to my knowledge,
13    but then there's many times where I didn't have
14    trust. I didn't trust her, and with this whole --
15    with this Santander and everything that -- I mean,
16    we just really didn't communicate a lot just
17    because she was upset with me because I didn't
18    trust her, you know, and it just came -- and when
19    we did start talking about it, it was arguments
20    after arguments.
21       And, I mean, then we'd have, like, an
22    argument, and we'd try to keep it at a minimum
23    just because we didn't want the kids involved.
24    They don't need to know what's going on. And
25    it -- I mean, we were just -- it came to points

Deposition of RAYMOND NELSON 4-12-13          Page 63

1     where, like I said, we were just arguing nonstop
2     about it, and, I mean, there was that point in
3     time that we just weren't communicating, getting
4     along, where to a point we almost -- I almost --
5     we almost had a break, I should say, but then we
6     didn't.
7        We decided we didn't agree on not to do that
8     just because of kids-wise. We didn't want to do
9     that, you know, out of the house for two weeks or
10    whatever, you know. But it did come to a point
11    where we were in separate sleeping quarters.
12 Q. You stated that you didn't -- at some point in
13    time you didn't trust her. What do you mean about
14    not trusting her?
15 A. When the truck got repo'd, to me, like I said, my
16    opinion tells me you weren't paying or something,
17    and so I was basically second-guessing her,
18    believing that she's making payments or stuff like
19    that.
20 Q. So she told you she made the payments, and she
21    wasn't late on the truck loan?
22 A. Correct.
23 Q. And you didn't believe her at that time?
24 A. No, no, I did not believe her.
25 Q. And why didn't you believe her?

Deposition of RAYMOND NELSON 4-12-13          Page 64

1  A. Just -- like I said, just my opinion is when
2     somebody comes, there's reasons for that, you
3     know.
4  Q. So what did you do after the repo occurred?
5  A. Far --
6  Q. Well, strike that. You said you didn't trust her
7     that the payment had been made. Did you think she
8     was lying to you?
9  A. Yeah.
10 Q. And the basis for that was the fact that a
11    repossession company had come out?
12 A. Yes.
13 Q. Did you ever ask your wife to show you copies of
14    the bills?
15 A. I never asked her personally.
16 Q. Did you ever ask her to show you copies of the
17    payments that had been made on the bills?
18 A. No, I did not. She brought them to me and showed
19    me; but like I said, I had a trust issue, and I
20    didn't really pay a hundred percent because, like
21    I said, I mean, we really weren't communicating
22    either. So it's like I just, like, whatever.
23 Q. So she brought you some paperwork to show you that
24    she had paid?
25 A. Right.

Deposition of RAYMOND NELSON 4-12-13        Page 65

1  Q. But you didn't review it?
2  A. Not at those times. Later down the road, you
3     know. Could have been a month or weeks, and, you
4     know, she would -- she showed me again. And then
5     I looked over some, not every single one, just the
6     ones that they were saying that she was behind,
7     you know, the month, whatever month it was.
8     I can't recall exactly what month it was.
9     She just said, "Here, I have proof here."
10 Q. Did you draw a conclusion about whether or not the
11    bills had been paid after you had looked at the
12    paperwork?
13 A. I still had doubt.
14 Q. So let me make sure I understand the time frame.
15    You first had doubt and didn't trust her around
16    the time that the truck was repossessed. Do you
17    remember when that was?
18 A. Trying to remember. I can't exact give -- I want
19    to say between '10-'12.
20 Q. Sometime --
21 A. I don't remember exactly. Just I know they were
22    there.
23 Q. So at the time of the repo, or around the time of
24    the repo, I should say, you started not trusting
25    your wife that she'd paid the bills on the truck

Deposition of RAYMOND NELSON 4-12-13        Page 66

1     loan?
2  A. More or less, yes. I mean, I had a little before
3     but more -- I mean, that confirmed it to me after
4     the repo.
5  Q. And then I think you also testified that she
6     brought you some paperwork to try to show you that
7     she was current on the loan, but you didn't review
8     it at that time, correct?
9  A. Correct.
10 Q. At what time period after that did you look at the
11    paperwork that your wife had presented to you?
12 A. It could have been a week, couple weeks, a month.
13    I don't -- you know, she was just trying to be
14    persistent to show me, but I was just not going to
15    pay attention, I mean, several times. But then,
16    you know, like I said, I can't give exact how long
17    after the first time.
18 Q. Once you did review what she was trying to show
19    you, did you believe her?
20 A. Like I said before, I still had my doubts.
21 Q. So you didn't believe her after you looked at the
22    paperwork?
23 A. Still had doubts.
24 Q. Did you do anything else to try to quiet those
25    doubts?

Deposition of RAYMOND NELSON 4-12-13        Page 67

1  A. I did not really.
2  Q. Did you tell Heather that you wanted to take over
3     making the loan payments?
4  A. I guess I said maybe I should start doing it.
5  Q. Did you say that to her?
6  A. That I should start, maybe I should start taking
7     these over. That's yes.
8  Q. You did say that?
9  A. Yeah.
10 Q. Do you remember when you said that?
11 A. Not exactly.
12 Q. What did she say in response?
13 A. Nothing really.
14 Q. She just ignored it?
15 A. Just rolled it off the shoulder.
16 Q. Did you at any point take over the payments?
17 A. No.
18 Q. Did you ever call Santander and try to determine
19    whether the payments were late or not late?
20 A. No, no.
21 Q. And you mentioned that you weren't communicating a
22    lot. Tell me how your communications with your
23    wife changed from what they were previously to not
24    communicating at all.
25         MR. HANNIBAL: Objection, form,

Deposition of RAYMOND NELSON 4-12-13        Page 68

1     foundation. Go ahead, Ray.
2  A. As far as how we were communicating before the
3     incident?
4  Q. Right.
5  A. Okay. We had general, you know, husband-wife
6     communications, how's the day, how was your
7     workday, you know, talk about kids and this.
8     Pretty much after the incident, basically it was
9     just asking about the kids.
10    That was -- we wouldn't ask how your day was,
11    how's this, how's that. It was just more or less
12    about the kids. That was it. Our communication
13    at this point was to almost zero.
14 Q. Were you arguing?
15 A. A lot.
16 Q. What's a lot, every day?
17 A. Couple times -- probably couple times a day.
18 Q. And what were you arguing about?
19 A. Arguing -- we were -- you know, doesn't matter who
20    started, but we were pretty much arguing about
21    loan being paid or not, this and that.
22 Q. So the arguments generally revolved around whether
23    or not the loan had been paid on time or whether
24    it was in default or outstanding still?
25         MR. HANNIBAL: Objection, form,

Heather Nelson  vs.
Santander Consumer USA, Inc., et al.

Deposition of RAYMOND NELSON
April 12, 2013

Deposition of RAYMOND NELSON  4-12-13          Page 69

1      foundation. Go ahead, Ray.
2  A. Yes.
3  Q. Why wouldn't you have just sorted out whether the
4      loan was outstanding or in default on your own
5      rather than argue about it all the time?
6  A. Just I — one, it wasn't in my name, so, I mean, I
7      can only go with her. I can't personally get
8      information from Santander if I'm not on the loan.
9  Q. And how do you know that?
10 A. That's just general, I mean --
11 Q. But you didn't call and try.
12 A. No. That's just general knowledge.
13 Q. You mentioned you almost took a break. Do you
14     mean you guys almost separated?
15 A. Yes.
16 Q. And when was that?
17 A. Around like -- pretty much around after repo
18     sometime. Like I said, I can't recall exactly
19     what date.
20 Q. A month after the repo?
21 A. What's that?
22 Q. A month after the repo or three months after the
23     repo?
24 A. Few weeks to a month, you know, general time
25     frames, because it came to a point where we were

Deposition of RAYMOND NELSON  4-12-13          Page 70

1      just arguing every day, and it just wasn't -- it
2      was just getting old arguing.
3  Q. And the argument was only about the Santander
4      loan, truck loan?
5  A. Yes.
6  Q. Was it about the van loan?
7  A. Well, it was about the whole -- I shouldn't say
8      just the truck. It was just, I mean, we never
9      really got into either one specific. It was just
10     about the loans, Santander.
11 Q. Did you argue about anything else?
12 A. Not really, no, because we weren't really
13     communicating, just pretty much arguing.
14 Q. And did you separate?
15 A. No.
16 Q. Whose idea was it to maybe separate?
17 A. Mine.
18 Q. Did you have discussions with her about separating
19     or was that just something you were thinking about
20     doing?
21 A. Basically it came down to "Maybe we should take a
22     break." And that's about as -- that's how it come
23     out, just like that, you know.
24 Q. And you made that statement or did she?
25 A. I did.

Deposition of RAYMOND NELSON  4-12-13          Page 71

1  Q. What was her response?
2  A. If that's the way I feel.
3  Q. And was there any other further follow-up
4      discussion on it?
5  A. As I stated before, we did have a little
6      conversation, that we both as adults agreed not to
7      do it just because of the kids. We didn't want to
8      put them through it.
9  Q. And you attribute this talk of separation to the
10     issues related to the repo; there was nothing else
11     going on at the time?
12 A. Correct.
13 Q. Were you guys behind on any other -- strike that.
14     Were you behind on any bills at the time of the
15     repossession?
16 A. I don't know.
17 Q. Were there any debt collectors calling you or your
18     wife around that time other than Santander?
19 A. I don't -- I don't believe so.
20 Q. Do you know or are you guessing?
21 A. I don't know.
22 Q. You mentioned separate sleeping quarters. When
23     did that happen?
24 A. Maybe a few weeks, three weeks after the incident
25     or the --

Deposition of RAYMOND NELSON  4-12-13          Page 72

1  Q. The repo?
2  A. The repo, yeah.
3  Q. And how long did it last for?
4  A. I would say at least numerous -- numerous months,
5      probably I would say more than six months, seven
6      months, I mean, at the low end.
7  Q. And where did you sleep?
8  A. In one of our other rooms.
9  Q. How many bedrooms are in your house?
10 A. Three.
11 Q. Presumably the master bedroom?
12 A. Yeah. There's a master bedroom, kid's room, kid's
13     room. I basically slept in the living room.
14 Q. You just said you slept in one of the other
15     bedrooms.
16 A. No. I said room.
17          MR. HANNIBAL: Yeah.
18 Q. Oh, you slept in a room?
19          MR. HANNIBAL: I want to get the
20     objection, mischaracterizes testimony, in
21     there.
22 Q. So you slept in the living room.
23 A. Correct.
24 Q. On a couch? In the chair?
25 A. Couch.

Heather Nelson vs.
Santander Consumer USA, Inc., et al.

Deposition of RAYMOND NELSON
April 12, 2013

1 Q. Did your kids know that you were sleeping in the
2     living room?
3 A. Yes.
4 Q. What did you tell them?
5 A. Just we weren't getting along at the time, just
6     not getting along.
7 Q. Did you tell anyone, any friends or family, that
8     you weren't getting along with your wife at the
9     time?
10 A. I don't -- no, I don't -- I didn't -- I don't
11     recall saying anything to anybody.
12 Q. You didn't confide --
13 A. No.
14 Q. -- in a family member that you were thinking about
15     separating from your wife?
16 A. No.
17 Q. Do you know whether your wife told anybody that
18     there was talk of separation?
19 A. She told anybody?
20 Q. Uh-huh.
21 A. I -- I couldn't honestly answer that.
22 Q. Did anybody talk to you, any family -- I mean any
23     family member approach you and ask you how your
24     marriage was or such that it would indicate she
25     had talked to somebody else or told somebody else?

1 A. No.
2 Q. Did you tell anybody that you were sleeping on the
3     couch in the living room?
4 A. No.
5 Q. Do you know whether she told anybody that?
6 A. I couldn't honestly answer that.
7 Q. You just don't know?
8 A. I don't know.
9 Q. Nobody approached you and said, "Hey, I heard
10     you're sleeping on the couch" or such that it
11     would indicate she told somebody else?
12 A. Right, correct.
13 Q. When did you stop sleeping on the couch?
14 A. I think shortly after the -- these guys, the
15     lawyer, one of the lawyers. I can't give an
16     approximate date.
17 Q. So sometime after the lawyers got involved do you
18     think you stopped?
19 A. Yeah, yes.
20 Q. Was there a reason -- what was the reason why you
21     stopped sleeping on the couch?
22         MR. HANNIBAL: I was going to
23     object, but I'm not going to.
24 A. My reason is -- personally my reason is because it
25     made me believe her when the lawyers took the case

1     because my knowledge lawyers generally aren't
2     going to take a case if you're wrong.
3         MR. O'MEARA: Off the record.
4         (Discussion off the record)
5 Q. Anything else or any other way in which your
6     relationship with your wife was affected other
7     than what you've told me about today?
8         MR. HANNIBAL: Objection, form,
9     foundation. Go ahead and answer, Ray.
10 A. Far as I know is, like I said, between us, you
11     know, the crying and not sleeping and stuff, far
12     as, I mean, I just know she was -- she was really
13     stressed over the whole situation.
14 Q. How do you know that?
15 A. I just -- you know, being with her for so long,
16     you could see it in somebody's demeanor and, you
17     know, face and stuff. It just --
18 Q. And what did you understand her to be stressed
19     about?
20 A. Just stress over the Santander as far as, I mean,
21     the whole thing.
22 Q. I'm just trying to be clear. What do you mean by
23     "the whole thing"?
24 A. The phone calls, the repo, us arguing, you know,
25     not getting along, and I know -- and I know it

1     stressed her because we weren't getting along, and
2     the kids had to go through, you know, and see
3     this.
4 Q. Did the kids know that you weren't getting along?
5 A. I'm sure they knew.
6 Q. What's your basis for being sure that they knew?
7 A. I mean, we formally didn't tell them, but they
8     just knew something wasn't right between Heather
9     and I.
10 Q. Did they say something to you that makes you
11     believe that they knew something wasn't right?
12 A. They just asked why I was -- I was sleeping in the
13     living room basically.
14 Q. And what did you tell them?
15 A. I just said that earlier, that just we weren't
16     getting along at the time.
17 Q. Anything else?
18 A. No.
19 Q. Was there anything else, any other way in which
20     Heather was affected or you and Heather were
21     affected by the phone calls or the repo?
22 A. At this time I don't recall anymore.
23 Q. Is there anything that would refresh your
24     recollection that would help you recall?
25 A. Possibly.

Deposition of RAYMOND NELSON 4-12-13          Page 77

1  Q. What might that be?
2  A. I really don't know. I mean --
3  Q. Do you have notes or --
4  A. Do I?
5  Q. Yeah.
6  A. No, I don't.
7  Q. Or e-mails regarding what was going on at the
8     time?
9  A. No.
10 Q. And you didn't discuss any of the problems in
11    getting along with your wife at this time with
12    anybody else?
13 A. No.
14 Q. Other than your children, no one else?
15 A. We both believe that family problems stay within
16    our general family.
17 Q. So no friends, no family members would know about
18    this?
19 A. Right, no, we really don't discuss our problems
20    with other ones.
21 Q. Were you and Heather having any money problems
22    around this time that you weren't getting along?
23         MR. HANNIBAL: Objection, form,
24    foundation. Go ahead and answer, Ray.
25 A. I don't believe so, no.

Deposition of RAYMOND NELSON 4-12-13          Page 78

1  Q. How would you know if you don't handle the bills
2     or the payments?
3  A. That's what I said. I don't believe so.
4  Q. So you don't know?
5  A. Right.
6  Q. You could have. You wouldn't know one way or the
7     other.
8  A. Correct.
9  Q. Did Heather ever tell you that any other debt
10    collectors were calling or there were any other
11    unpaid bills or overdue bills?
12         MR. HANNIBAL: Objection, form,
13    foundation. Go ahead and answer, Ray.
14 A. No.
15 Q. Other than what you've already mentioned, did the
16    situation with Santander affect your children in
17    any other way?
18         MR. HANNIBAL: Objection, form,
19    foundation. Go ahead and answer, Ray.
20 A. The only thing I can recall is the day of the
21    repo, that we -- my wife -- sorry, my wife and I
22    went outside, and it was very, very early in the
23    morning. And I don't know approximate time, but I
24    know it was early because it was still dark,
25    somewhat dark, out.

Deposition of RAYMOND NELSON 4-12-13          Page 79

1         And my daughter come to the window asking
2     what's going on and saying, "Why are they taking
3     the truck? Why are they taking the truck?" And
4     she had tears down her face, and basically we
5     stopped and told her "Just go back in your room.
6     We're handling this."
7         MR. HANNIBAL: Can we stop again?
8     We have to plug the meters. We're out at the
9     meters.
10        MR. O'MEARA: Yeah, sure. Take a
11    break.
12        (A short break is taken)
13 Q. Mr. Nelson, you were mentioning the repo and your
14    daughter's reaction to it. I'm going to come back
15    to the repossession here in just a little bit; but
16    just to close it out, anything else regarding how
17    these calls may have affected or the Santander
18    situation may have affected you and/or your wife?
19        MR. HANNIBAL: Objection, form,
20    foundation. Go ahead, Ray.
21 A. At this time there's -- I don't recall any more.
22 Q. And is there anything that would let you recall
23    more or refresh your memory?
24 A. I don't think so.
25 Q. Did Heather ever see a doctor as a result of the

Deposition of RAYMOND NELSON 4-12-13          Page 80

1     Santander situation?
2         MR. HANNIBAL: Objection, form,
3     foundation. Go ahead.
4  A. To my knowledge, no.
5  Q. And when I say "doctor," I mean a medical doctor.
6     How about a counselor, did she see a counselor at
7     all?
8  A. Like I said, to my knowledge, I -- I don't -- I
9     don't believe so.
10 Q. You would know if your wife sought medical
11    attention.
12 A. You would think so.
13 Q. Did you guys seek any marriage counseling?
14 A. No.
15 Q. I believe I've asked you this, but you didn't
16    confide in any friends or family for advice or to
17    lean on regarding the situation at that time?
18        MR. HANNIBAL: Objection, form,
19    foundation. Go ahead and answer, Ray.
20 A. No.
21 Q. And I'm talking about sort of the strain and the
22    upset that you had described affecting you and
23    your wife. And you don't know whether or not she
24    confided in anybody?
25 A. Right.

Heather Nelson vs.
Santander Consumer USA, Inc., et al.

Deposition of RAYMOND NELSON
April 12, 2013

Deposition of RAYMOND NELSON 4-12-13     Page 81

1 Q. Do you know whether or not she took any
2     prescriptions or drugs during that time?
3        MR. HANNIBAL: Objection, form,
4     foundation. Go ahead and answer, Ray.
5 A. Pretty sure she didn't.
6 Q. And whether they'd be prescription or over the
7     counter, you don't think she took any drugs?
8 A. Pretty confident she didn't. She's not a big
9     medicine fan, person.
10 Q. So as far as you know, she didn't seek any medical
11     or mental health treatment during that time?
12 A. Correct.
13 Q. And when I say during this time, I'm referring to
14     the time period when the calls were coming from
15     Santander and/or the repos.
16 A. Correct.
17 Q. During this time that there was upset in your
18     marriage and/or that your wife was upset, was she
19     unable to care for your children?
20 A. Absolutely not.
21 Q. Was she able to get up and go to work every day?
22 A. Yes.
23 Q. I presume she was able to take care of herself
24     still and go about her daily tasks?
25 A. Yeah.

Deposition of RAYMOND NELSON 4-12-13     Page 82

1 Q. Did you seek any counseling?
2 A. No.
3 Q. No drugs? No prescriptions?
4 A. No.
5 Q. Did your wife either abuse or increase her use of
6     alcohol or food at that time?
7 A. Alcohol, definitely not; food, I don't --
8 Q. Do either you or your wife smoke?
9 A. No.
10 Q. And there was -- either you or your wife use
11     any -- well, strike that. Do you know whether
12     your wife ever called Santander herself?
13 A. Do not know. ·
14 Q. So you weren't present during any calls that she
15     initiated to Santander if she did?
16 A. Actually, one on the day of the repo. That
17     morning after the repo I knew she called.
18 Q. And were you there at the time she called or she
19     just told you she called?
20 A. I was in the area.
21 Q. What phone did she use to call Santander?
22 A. I can't honestly -- can't -- I honestly can't
23     remember what one she used. I know it wasn't
24     mine.
25 Q. I don't know if I asked you this before, and I

Deposition of RAYMOND NELSON 4-12-13     Page 83

1     apologize if I'm repeating myself, but during any
2     calls between Santander and Heather, did you
3     ever -- well, strike that.
4        Let's talk about the truck repossession that
5     you had mentioned a couple of times before. Do
6     you recall when that repossession took place?
7 A. I can't remember. I know the day, but I can't
8     remember if it was '11 or '10. And the only
9     reason why I remember this is because we were
10     scheduled to go out of town that Saturday morning.
11     We were making a little Memorial Day trip with the
12     kids.
13 Q. So this was Saturday over Memorial Day weekend.
14     Is that what you're --
15 A. Yeah, that was Memorial Day weekend, correct.
16 Q. You just don't remember what year it was?
17 A. Yeah, '10 or '11, yeah. I'm bad but --
18 Q. So tell me what you remember about the
19     repossession on that Saturday, Memorial Day
20     weekend.
21 A. All I remember is I was laying on the couch. I
22     get a tap on the forehead, "Come outside." I'm
23     just, like, dead asleep. I'm like, "What's going
24     on?" So it took me a little bit to comprehend,
25     and then I heard, you know, conversation by the

Deposition of RAYMOND NELSON 4-12-13     Page 84

1     living room window. So then I knew something was
2     up, obviously.
3        I didn't know what it was about until I went
4     outside, and, you know, they took the truck. And
5     I said they were -- I can't remember exactly what
6     time that it was either. I would say between
7     3 a.m. and 6, 3 to 7 a.m., probably in that time
8     frame that they were there.
9        All I know is, like I said, it was still
10     dusk, and we were -- like I said, we were going to
11     go out of town to Milwaukee to take the kids to
12     the zoo and the museum. And after that whole
13     incident, you know, they took the truck. Heather
14     was going to call, but then she stopped because --
15     or she realized, well, they're not going to be
16     open yet. And at that time is when they finally
17     opened, you know. She was calling, and I know she
18     was because I was there.
19        But then at that time my mother and my niece
20     were going -- was going to make the trip with us,
21     so then I kind of pulled myself away from that
22     conversation because they were at the door, and I
23     was letting them in.
24 Q. Who tapped you on the forehead and said, "Wake
25     up"?

Heather Nelson vs.
Santander Consumer USA, Inc., et al.

Deposition of RAYMOND NELSON
April 12, 2013

Deposition of RAYMOND NELSON 4-12-13          Page 85

1 A. Heather. It had to have been Heather because the
2    kids were still sleeping.
3 Q. And you said you were lying on the couch. Why
4    were you -- did you fall asleep on the couch or --
5 A. No, that's because that's where I slept.
6 Q. So you were already separated at the time that the
7    repo occurred -- or, excuse me, strike that. You
8    were already sleeping on the couch due to the
9    disagreements with your wife at the time the repo
10   occurred?
11 A. I just -- at that point I -- I can't recall or I
12   want to say that I just -- my guess would -- at
13   that time I fell asleep I think on the couch
14   because the TV was still on so --
15 Q. You weren't sleeping on the couch at that point
16   because of problems with Heather related to the
17   Santander situation yet; were you?
18 A. I don't think so. More or less the problems came
19   after, you know, the repo time where we really got
20   into arguing.
21 Q. So what did Heather say when she tapped you on the
22   forehead and woke you on that Saturday?
23 A. I can't recall a hundred percent. Probably "Get
24   up" or "Come here."
25 Q. And then what? Did you both go outside?

Deposition of RAYMOND NELSON 4-12-13.          Page 86

1 A. No. Like I said, she went outside, and it took a
2    few minutes to get the barrier, you know, figure
3    out what's going on.
4 Q. Were you observing from inside?
5 A. And then after, you know, coming out, I heard
6    conversation by the house, so I went outside
7    and -- you know, because I didn't know if it was
8    somebody by the house or -- but then at that
9    moment I knew it was Heather and a repossessor.
10 Q. Did she know what was going on? Did she know that
11   it was a repossessor at the time that she went
12   outside or --
13 A. I don't -- obviously I don't know a hundred
14   percent. My guess is if she got up and seen a
15   truck backing into our driveway, I would think
16   something is going on.
17 Q. That was going to be my next question is how was
18   she awoken; do you know? Did she tell you?
19 A. I know -- I mean, she -- she didn't sleep well
20   that night, and I know that, you know, she -- you
21   know, like I said, she heard something backing
22   into our driveway, you know, because a lot of the
23   trucks have those beepers while they're backing
24   up.
25 Q. And at some point did you go outside?

Deposition of RAYMOND NELSON 4-12-13          Page 87

1 A. After I heard the conversation, after I got my
2    thoughts, and, yes, I went outside.
3 Q. What did you hear of the conversation before you
4    went outside?
5 A. Just mouth, you know, like -- I couldn't -- I
6    couldn't hear word for word, just muffling, you
7    know, like I said, like closed doors; and, you
8    know, if a door's closed, you can't hear, but you
9    know somebody is right there because, you know,
10   the windows are slightly cracked.
11   But I knew somebody was by my house, but I
12   didn't know who. I didn't even know Heather was
13   outside until I was outside. Heather tapped me in
14   the head, and I'm dead asleep.
15 Q. Can you tell me about the conversation once you
16   went outside?
17 A. Just that he was there to pick the truck up, you
18   know, and she's like, "I want proof." You know, I
19   can't recall. That would be my guess, that she
20   wanted to see paperwork or proof or --
21 Q. Just to be clear, I'm not asking you to guess as
22   to what the conversation might have been. If you
23   don't recall, let me know that you don't recall.
24 A. I don't recall exactly the whole thing because --
25 Q. Understood.

Deposition of RAYMOND NELSON 4-12-13          Page 88

1 A. -- you know, I'm -- like I said, I just woke up
2    and -- but then, you know, just finally, you know,
3    I believe -- I think the -- I don't know who
4    called them or, I mean, Heather might have. I
5    know Sun Prairie Police Department was there and
6    stuff.
7    I don't know if the repossession called or
8    Heather did. I'm not a hundred percent sure
9    because there was so much going on.
10 Q. Well, what was going on? I'm just trying to get a
11   sense, and, you know, just tell me what you
12   remember.
13 A. Just the whole repo, the repossession and stuff,
14   so I don't know, you know -- you know, because at
15   that point anybody is going to say, you know,
16   "You're not taking it." They're going to say,
17   "Yes, you are."
18   Well, before it gets heated or escalated, you
19   know, not saying it did, that at that point, you
20   know, obviously she -- she would -- if she called
21   the cops, she would call because I wouldn't want
22   anybody to -- just showing up, you know. You
23   don't know.
24 Q. Well, did you have any direct conversation with
25   the repossession person outside?

Heather Nelson vs.
Santander Consumer USA, Inc., et al.

Deposition of RAYMOND NELSON
April 12, 2013

1 A. I just said, "Well," I said, "let me see the
2   paperwork." And at that time there was, like, an
3   officer there.
4 Q. So there was a police officer there by the time
5   you --
6 A. Right.
7 Q. -- came outside and engaged --
8 A. Well, I was already out there by the time I said,
9   "Let me see the paperwork." And then the officer
10  said it would be best if he grabbed it and brought
11  it to me. He goes, "That way it's -- that way
12  nothing gets" -- you know, kind of diffuses the
13  situation because --
14 Q. Before the police arrived, did you observe a
15  conversation between the repossession person and
16  your wife?
17 A. Just they were -- you know, they were just talking
18  back and forth as far as she's trying to figure
19  out why they're there, and he -- you know,
20  obviously he's there because he got an order for
21  repossession.
22 Q. Did he have an order for repossession?
23 A. He had paperwork. I mean, I don't -- like I said,
24  I don't know what they're supposed to look like.
25  I just know it said he was -- it was there for the

1   truck.
2 Q. So --
3 A. And like I said, it was still kind of dark out,
4   so, I mean, with a little flashlight, I mean, you
5   couldn't really see a whole -- I didn't really
6   tune into it a whole hundred percent because, like
7   I said, with it going on, the repossession, just
8   everything was --
9 Q. Did you understand that he was repossessing the
10  car because the payments hadn't been made?
11 A. He just said he was repo'ing it. I don't
12  specifically recall for what.
13 Q. Do you know what agency or what company the
14  repossession people worked for?
15 A. I don't know. I can't remember the name of the
16  company, but I know it's one in Cottage Grove
17  because I went and picked it up.
18 Q. What was the demeanor of the repossession agent?
19  How did he act?
20           MR. HANNIBAL: Objection, form and
21      foundation. Go ahead, Ray.
22 A. He was fine at first, and then, you know, people
23  were going to go back and forth. And I know he
24  was raising his voice, and at one point I said
25  "shush" to both of them because the neighbors.

1   And then I know at one point he was -- to me it
2   was very inappropriate to be, if I may, this close
3   to somebody's face. To me, I wouldn't especially
4   like that. (Demonstrating)
5 Q. And he was doing that to you?
6 A. No, to Heather.
7 Q. Were he and Heather arguing?
8 A. I'd say bickering back and forth.
9           MR. HANNIBAL: Can I just let the
10      record reflect that Ray came about
11      approximately six inches from my face to kind
12      of reflect the distance? Was that accurate
13      in your mind?
14           MR. O'MEARA: I don't have any
15      objection to that.
16 Q. So did he try to take the car before the police
17  got there -- excuse me, the truck? We're
18  referring to the truck.
19 A. What I recall is he had one of the flatbed trucks;
20  and before we knew what was going on, he had a
21  chain or wench or whatever would be probably
22  appropriate, you know, pulled out and hooked to
23  the truck.
24 Q. Was your truck -- I presume you have a driveway.
25  Was your truck in your driveway?

1 A. Yes.
2 Q. And he had backed up into the driveway to hook the
3   back of the truck; is that it?
4 A. Yeah. He had backed into the driveway and had it
5   hooked to the front of the truck because I back my
6   truck in.
7 Q. Who called the police?
8 A. Like I said, I don't know which person did.
9 Q. You don't recall calling them yourself?
10 A. No, I personally didn't. I don't know if it was
11  the repossessor people or Heather. I couldn't
12  personally tell you, but I know I didn't.
13 Q. At some point the police showed up?
14 A. Yes. One showed up, and then normally on a call
15  they usually have another one, and they'll show
16  up. Maybe a minute or a couple minutes later
17  another one arrived.
18 Q. And what did the police do?
19 A. Really nothing.
20 Q. Well, did they talk to the parties involved?
21 A. They just told us that we had to give it up.
22 Q. Did they look at any of the paperwork?
23 A. Not really.
24 Q. I thought you mentioned that --
25 A. He grabbed it and just went -- he grabbed the

Heather Nelson  vs.
Santander Consumer USA, Inc., et al.

Deposition of RAYMOND NELSON
April 12, 2013

1   paperwork from the repossessor so I couldn't
2   personally get close to him and basically went
3   like this. He didn't personally look at it.
4   (Demonstrating)
5   Q. Did you review the paperwork?
6   A. I just scanned it quickly. Like I said, it was a
7   little darker out too, so, I mean, at that point I
8   can't argue because the police -- I mean, when a
9   police says anything, you can't get arguing with
10   them or they're going to get you for disorderly,
11   so at that point we just gave up.
12   Q. When you say you gave up --
13   A. Just gave it up, the truck up, and he did -- the
14   officer asked -- well, the repossessor asked for a
15   key because they don't want to damage a vehicle
16   obviously, and at that point I was like, "No, I
17   want to know why."
18        Well, then that's when the officer said, "No,
19   he's taking it, so give up the key." So I went
20   inside, got the key.
21   Q. Were you able to remove any of your personal
22   belongings from inside the car -- truck?
23   A. They only allowed me a few seconds to grab work
24   keys. That was about it. I mean, really he gave
25   us like a couple minutes to grab. Like I said, I

1   grabbed my work keys and things I could think of
2   at that moment just to quickly grab.
3   Q. Did you observe anything else during the time that
4   the repossession was going on?
5        MR. HANNIBAL: Objection, form,
6   foundation. Go ahead and answer, Ray.
7   A. Not -- not really what I can recall at that time.
8   Q. Nothing else stands out in your mind?
9   A. No. I was just -- you know, I'm a very
10   down-to-earth person, laid back, and I was more --
11   I guess I should say more worried about neighbors
12   and this, you know, stuff like that, and keeping
13   my eye on my wife, you know, as far as, you know.
14   Q. Was your wife upset?
15   A. She was crying.
16   Q. Was she angry?
17   A. I wouldn't say angry; upset, like you said:
18   Q. Was there shouting or argument between her and the
19   repossession agent?
20   A. Just the bickering, general bickering back and
21   forth, but no real true elevated, you know,
22   screaming.
23   Q. No physical altercation between them?
24   A. No. Just, like I said, the agent was too close,
25   and I was like, "Back up." That's all I told him,

1   and he backed up.
2   Q. Did any of the neighbors witness what was
3   occurring outside?
4   A. I don't think so.
5   Q. And were your children asleep in the house at that
6   time?
7   A. They were at first, but then my daughter, like I
8   said earlier, you know, when I -- you know, after
9   I got out there then heard, you know, stirring
10   around, so she got up.
11        And our driveway is here. Our living room is
12   here (demonstrating). There's a window, and she
13   was at the window asking, "Why are they going to
14   take the truck?" And we're just like, "Just go
15   back to bed." She had tears, you know, still
16   standing there, and we told her numerous times.
17   She had tears, crying, "Why are they taking the
18   truck?"
19        At that moment I walked up to the outside
20   screen where the driveway is and said, "Let us
21   handle it. Just go back. You know, it has
22   nothing to do with you."
23   Q. So she must have woken up while you were outside
24   and just came to the window?
25   A. Correct.

1   Q. Did she go back to bed?
2   A. She went into her room but not back to bed.
3   Q. Did you talk about it with her later?
4   A. No, just -- well, I shouldn't say no. We just
5   told her we'll get it back.
6   Q. So the police said, "Step aside," and the truck
7   was repossessed?
8   A. Just, yep, give it up to them.
9   Q. What happened then? What happened next? Excuse
10   me.
11   A. We just -- like I say, after, you know, the cops
12   stayed around until he pulled away, and then they
13   just said, "Here's a case number," gave us a card,
14   you know, and we just basically went inside.
15        And, like I said, Heather wasn't thinking
16   straight, so she was going to call Santander but
17   realized it was way too early for them to even be
18   open. And then I don't know what time they
19   opened, 7, 8, whatever, our time, but like I said,
20   she called a second time to get ahold.
21        And I knew she was calling because she told
22   me she was calling, but then, like I said, my
23   mother and my niece were just showing up because
24   they were going to go to Milwaukee with us.
25   Q. So you didn't actually hear Heather's conversation

Heather Nelson  vs.
Santander Consumer USA, Inc., et al.
Deposition of RAYMOND NELSON  4-12-13          Page 97

Deposition of RAYMOND NELSON
April 12, 2013
Deposition of RAYMOND NELSON  4-12-13          Page 99

1   because your mother and niece had showed up?
2 A. Correct.
3 Q. Did she tell you about the phone conversation
4   after she got done with it?
5 A. No, not a hundred percent really because we were
6   trying not to let that incident ruin our little
7   trip for the kids and stuff.
8 Q. Before she called Santander, did she tell you what
9   she was going to call them about and discuss?
10 A. Why they were -- what's going on, why -- you know,
11   why they were there to repo.
12 Q. Did she express to you that she was under the
13   belief that she was current on the payments?
14 A. That she expressed that she was up to date?
15 Q. Yeah, to you, not to the -- but to you.
16 A. Right. Okay. No, I don't -- I don't believe so.
17 Q. For example, you didn't ask her, "Hey, why did we
18   get repossessed?" And she didn't say, "I don't
19   know. I think we're up to date on the payments"
20   or --
21 A. No. I never -- just because, like I said,
22   everything -- it was a shock, surprised, and then
23   with family coming there, we tried not to let them
24   in on what's going on basically.
25 Q. So you didn't -- did you tell -- it was your

1   well after 10.
2 Q. And did you stay overnight in Milwaukee? Was this
3   an overnight trip or just a day trip?
4 A. Yes, yes, we were planning on staying over to see
5   numerous things out there.
6 Q. And how did you guys get to Milwaukee?
7 A. Took the van.
8 Q. Took the minivan?
9 A. Yes.
10 Q. So it was you, your wife, your two children, and
11   then your mom and your niece?
12 A. Correct.
13 Q. Were you able to put the repo out of your mind and
14   enjoy the trip?
15 A. I did try to for the most part. I know Heather --
16   all I -- I was making phone calls trying -- I --
17   I -- I know a person, this one person, who is a
18   lawyer, and so I called, asked, you know, can they
19   just do this.
20       MR. HANNIBAL: Okay. Don't talk
21   about your conversations with the lawyer.
22       THE WITNESS: Okay.
23 Q. Why don't you just tell me what you did next while
24   you were on your trip. You were making phone
25   calls trying to get --

---

1   mother and niece I believe you mentioned who
2   showed up?
3 A. Yeah.
4 Q. Did you tell them what just had happened that
5   morning?
6 A. They asked where the truck was, because my truck
7   can't fit in the garage, so they -- you know, at
8   that point I'm like -- I just said -- we just
9   said, "It got repo'd." And that's as far as we
10   went on that.
11 Q. That was it? There was no follow-up conversation?
12 A. Right, because I -- you know, all she said is,
13   "Just don't let it bother you," my mother did,
14   "Just try to, you know, have a good weekend."
15   But, you know, that was about as far as that went.
16 Q. So there was no discussion about the details of
17   the repo or the reasons for the repo. It was just
18   a statement, and then you guys moved on?
19 A. Correct.
20 Q. Did you end up taking your trip to Milwaukee?
21 A. Yes, we ended up taking it. We left several hours
22   after we wanted to get started, obviously.
23 Q. What time were you set to go? What time did you
24   plan to go?
25 A. We planned on trying to leave by 8, but it was

1 A. I just made some general phone calls to ask
2   questions.
3 Q. Including to a friend who was a lawyer?
4 A. Well, not really a friend, just a --
5 Q. A lawyer you've used?
6 A. Well, I haven't used, just one of my -- I just
7   generally know him but not like a friend-friend.
8 Q. Did you call anybody else other than him?
9 A. No.
10 Q. What happened with the truck? Did you ever get it
11   back?
12 A. Yes.
13 Q. Tell me about that.
14       MR. HANNIBAL: Objection, form,
15   foundation. Go ahead and answer, Ray.
16 A. Just Heather must have got -- I guess it would be
17   an amount you had to pay and stuff, so we just got
18   the money and went and paid, you know, had to pay
19   it.
20 Q. When was that? Was it over the Memorial Day
21   weekend or was it --
22 A. Oh, God, no. It was, I would say, later that week
23   after Memorial Day.
24 Q. Do you know how much you had to pay?
25 A. I can't give exact amount. I can't totally

Heather Nelson vs.
Santander Consumer USA, Inc., et al.

Deposition of RAYMOND NELSON
April 12, 2013

1     remember. I know it was -- I know it was greater
2     than $1,400. I know that for sure, but I can't --
3   Q. And that was the amount that the repossession
4     company required to release the truck?
5   A. For my knowledge, that's what Santander and the
6     repo communicated with, but, you know, I don't
7     know how the whole thing works.
8   Q. You didn't communicate with anybody directly.
9     This is just based on what Heather told you?
10  A. She told me the amount, and then I went and picked
11     it up.
12  Q. And did you also pay the amount when you got there
13     to release the car?
14  A. To the repossession, yes.
15  Q. Yeah.
16  A. I did.
17  Q. How did you pay? Cash? Check? Debit card?
18  A. Not a hundred percent sure, but I think cash.
19  Q. Is this cash that you had on hand or did you have
20     to borrow it from --
21  A. I borrowed it.
22  Q. Who did you borrow it from?
23  A. From a friend.
24  Q. What's your friend's name?
25  A. Brad.

1   Q. What's his --
2  A. Miller.
3   Q. And did you pay Mr. Miller back?
4  A. Correct.
5   Q. Did you tell Mr. Miller the reason for borrowing
6     the money?
7  A. No.
8   Q. So you didn't tell him it was about to get your
9     car back. You just asked to borrow the money?
10  A. I just asked to borrow the money.
11  Q. Anything else you remember about the repossession?
12  A. (No audible response)
13  Q. What was the condition of your truck when you got
14     it back?
15           MR. HANNIBAL: Objection, form,
16     foundation. Go ahead, Ray.
17  A. Far as just any damages? I believe it was the
18     same.
19  Q. Has that truck ever been repossessed before this
20     Saturday over Memorial Day weekend?
21  A. I think with HSBC.
22  Q. It was repossessed once by HSBC?
23  A. Yes, I believe so.
24  Q. Was that prior to this Saturday, Memorial Day
25     weekend?

1  A. Yes. It was before that.
2   Q. Do you remember when before that?
3  A. Not -- not really exactly.
4   Q. Was it a couple of months or a couple of years
5     prior to that?
6  A. I would be guessing maybe months. It wouldn't be
7     years. It would be months apart would be my
8     guess. I'm not a hundred percent sure.
9   Q. Were you present when the truck was repossessed
10     previously?
11  A. I was there. It was almost -- it was, like, the
12     same situation. I was there.
13  Q. They came to your house?
14  A. Yes. I mean, it was basically the same routine.
15  Q. They came with --
16  A. Right.
17  Q. -- some paperwork saying --
18  A. Right.
19  Q. -- "We have authority to take your car," and they
20     did?
21  A. Right, right. By the time we got outside, it
22     wasn't on a truck or nothing. It was just hooked
23     up.
24  Q. Are you sure that the time that your daughter
25     observed the repossession wasn't the prior

1     repossession by HSBC versus the one involving
2     Santander?
3  A. I'm a hundred percent sure because I know it was
4     that weekend, and that day is in my mind just
5     because of the vaca -- you know, I shouldn't say
6     vacation, you know, our little trip.
7   Q. Did you ever -- strike that. Was the reason that
8     your truck was repossessed the prior time because
9     payments were outstanding?
10  A. I -- I really don't know. I don't do --
11  Q. You didn't handle the bills.
12  A. I don't handle the bills. I've never handled the
13     bills.
14  Q. So you don't know --
15  A. Why.
16  Q. -- the circumstances surrounding that one. You
17     obviously got your truck back in that situation.
18  A. Correct.
19  Q. Were you the one who went down and paid and
20     retrieved it? I'm talking about the first
21     repossession.
22  A. Right. I do believe that Heather and I were both
23     there that time.
24  Q. Has the truck been repossessed at all since this
25     Memorial Day weekend incident?

Heather Nelson vs.
Santander Consumer USA, Inc., et al.

Deposition of RAYMOND NELSON
April 12, 2013

Deposition of RAYMOND NELSON 4-12-13                    Page 105

1  A. No.
2  Q. How about the van, the minivan, has that ever been
3     repossessed?
4  A. No, but that day they were there, the Memorial Day
5     weekend day, the gentleman, they said -- he goes,
6     "We're going to come get your van."
7  Q. Oh, he said that?
8  A. Yes.
9  Q. Did he say that to you or Heather?
10 A. Just said it to us with the cops there. Said,
11    "We're coming to get the van." He just generally
12    looked in our direction.
13 Q. Anything else? Did you respond to that at all?
14 A. No, just -- not really, I mean, as far as, you
15    know, don't know if it's just verbal threat or --
16    you know, you don't know.
17 Q. Did Heather respond to that at all?
18 A. No.
19 Q. Did they come for the van at all?
20 A. Never to my knowledge or her knowledge, no. Well,
21    they never got it or came, so I don't know if they
22    tried to come and get it.
23 Q. The van was parked generally in your garage; is
24    that correct?
25 A. Sometimes, not all the time. Generally my truck

Deposition of RAYMOND NELSON 4-12-13                    Page 106

1     is the last in. We just have a single-lane
2     driveway.
3  Q. So do you know whether or not Santander or the
4     repossession agent ever tried to repossess the
5     van?
6            MR. HANNIBAL: Objection, form,
7        foundation, asked and answered. Go ahead,
8        Ray.
9  A. I don't -- I don't -- I don't know.
10 Q. You don't have any knowledge?
11 A. I don't have any -- I don't have any knowledge.
12 Q. We talked I think a fair amount a little while ago
13    about the ways in which you observed the effect of
14    either the calls or the repossession on your wife
15    and/or on your relationship.
16           Now that we're talking about the repo, is
17    there anything else in addition to what we've
18    already talked about that affected your wife or
19    your relationship from this repossession over the
20    Memorial Day weekend?
21           I think we've covered it all before, but if
22    not, I want you to tell me how --
23 A. Right.
24 Q. -- the repossession affected her or your
25    relationship.

Deposition of RAYMOND NELSON 4-12-13                    Page 107

1            MR. HANNIBAL: Objection, form,
2        foundation. Go ahead, Ray.
3  A. I don't -- I can't recall at the time any more
4     than what was already said.
5  Q. What affected your relationship with your wife
6     more, the telephone calls or the repossession over
7     Memorial Day weekend?
8  A. I don't really think there's a general area where
9     you could say one affected more than the other.
10 Q. So there's no way to attribute --
11 A. It's just all in one basket, you know, just all --
12 Q. And I asked whether or not the van had been
13    repossessed or attempted to be repossessed after
14    the Memorial Day weekend. Was it ever repossessed
15    prior to the Memorial Day weekend?
16           MR. HANNIBAL: Go ahead.
17 A. Was it ever taken?
18 Q. Yeah.
19 A. No.
20 Q. Was there ever an attempt to take the van before
21    the Memorial Day weekend repossession of the
22    truck?
23           MR. HANNIBAL: Now, objection,
24        form, foundation. Go ahead and answer, Ray.
25 A. I don't believe so.

Deposition of RAYMOND NELSON 4-12-13                    Page 108

1  Q. I just wanted to make sure.
2  A. Right, right.
3  Q. I didn't know if I asked you pre. We're almost
4     done so -- who's Warren Olson?
5  A. That's my father-in-law.
6  Q. And Kathy Olson?
7  A. That's Heather's, I guess, step-mom.
8  Q. Do they know anything about any of the subjects
9     that we're talking about here today?
10           MR. HANNIBAL: Objection, form,
11       foundation.
12 A. I don't know if they do.
13 Q. Have you discussed these?
14 A. I haven't. I don't know, you know. I don't know
15    if I -- I haven't told anything.
16 Q. You haven't had any conversations with them
17    yourself about either the Santander calls or the
18    repossession or the problems between you and
19    Heather?
20 A. Correct.
21 Q. Okay. Do you know whether Heather spoke to them
22    about any of those issues?
23 A. I don't know.
24 Q. I'm going to run through the same questions with
25    some folks. Cindy Olson, who is she?

Heather Nelson vs.
Santander Consumer USA, Inc., et al.

Deposition of RAYMOND NELSON
April 12, 2013

1  A. Mother-in-law.
2  Q. Your mother-in-law?
3  A. Yes, Heather's mom.
4  Q. Did you have any conversations with Cindy Olson
5     regarding the calls, the repo, any problems for
6     Heather's emotional condition?
7           MR. HANNIBAL: Objection, form,
8     foundation. Go ahead and answer, Ray.
9  A. No, I have not.
10 Q. And do you know if they know anything about it
11    from somebody else?
12 A. I don't know.
13 Q. Any idea whether Heather spoke to her about it?
14 A. Not sure.
15 Q. Vicky Nelson?
16 A. That's my --
17          MR. HANNIBAL: Objection, form,
18    foundation. Go ahead and answer.
19 Q. Who is it?
20 A. My mother.
21 Q. And have you had any discussions with her about --
22    I can list them all or I can say these issues
23    about the calls, the repossession any of the
24    marriage problems or the emotional condition of
25    your wife?

1  A. The calls, no; marriage, no. She knew obviously
2     about the repossession.
3  Q. Do you know whether your wife spoke to her about
4     any of those issues other than the repo that we're
5     talking about?
6  A. No, I don't know.
7  Q. How about Virginia Nelson?
8  A. That's my --
9  Q. Who is Virginia Nelson?
10 A. My sister.
11 Q. Did you speak to her about any of these issues?
12 A. No.
13 Q. Do you know if Heather did?
14 A. No.
15 Q. No, you don't know?
16 A. I don't know, sorry.
17 Q. And who is Nicole Badgley?
18 A. That is one of Heather's friends.
19 Q. Do you know where she lives?
20 A. No, I do not.
21 Q. Did you ever talk to her about any of these
22    issues?
23 A. No.
24 Q. Do you know whether Heather discussed any of these
25    issues with her?

1  A. No, I do not.
2  Q. Do not know?
3  A. I don't know, yeah.
4  Q. Who is Andrea Sipek?
5  A. Heather's friend.
6  Q. Same questions. Did you have any discussions with
7     her about any of these issues?
8  A. I have not, no.
9  Q. Do you know whether Heather did?
10 A. Possibly, because they were friends and coworkers.
11 Q. Are you guessing?
12 A. I'm just assuming.
13 Q. You're assuming, okay. Heather, for example,
14    didn't ever tell you, "Yeah, I've confided in my
15    friend Andrea at work and told her about the
16    situation," nothing like that?
17 A. Right. I should -- she never personally told me.
18    Like I said, I'm just assuming because I know they
19    were coworkers and good friends at the time, and
20    all I know -- like I said, all I know is I know
21    she had calls to work, so that's I know how Andrea
22    knows.
23 Q. Heather had calls to work?
24 A. Had received phone calls.
25 Q. And how do you know Heather received phone calls

1     at work?
2  A. She has mentioned that to me. Heather has
3     mentioned that to me.
4  Q. Do you know how many phone calls she received at
5     work?
6  A. No, I do not.
7  Q. Would she answer those phone calls at work or
8     just --
9  A. I -- I don't know. I'm not there.
10 Q. Who is Diane Burling?
11 A. Excuse me?
12 Q. Diane Burling. Do you know who that is?
13 A. Oh, coworker of Heather's.
14 Q. Oh, Heather's coworker, and coworker where; do you
15    know?
16 A. I believe Care Wisconsin.
17 Q. And, I'm sorry, to back up, Andrea Sipek, she was
18    a coworker. Where was she a worker at?
19 A. At Care Wisconsin as well.
20 Q. Care Wisconsin. Did you have any conversations
21    with Diane Burling regarding any of these issues?
22 A. No. I only met her once.
23 Q. Did you have any knowledge that Heather had
24    discussions with her about any of these issues?
25 A. I have no knowledge of it.

Heather Nelson vs.
Santander Consumer USA, Inc., et al.

Deposition of RAYMOND NELSON
April 12, 2013

1 Q. Who is Robin Brennan?
2 A. Coworker at the same facility.
3 Q. Another coworker. Okay. Same questions. Did you
4    have any conversations with her regarding any of
5    these issues?
6 A. No.
7 Q. Do you know, as you sit here today, whether
8    Heather had any conversations with her?
9 A. No, I do not.
10 Q. Georgia Wheelock, do you know who that is?
11 A. A coworker of Heather's, and that one I don't
12    know. I know it's just a coworker. I don't know
13    place.
14 Q. Don't know where. Did you have any conversations
15    with Ms. Wheelock?
16 A. No.
17 Q. Do you have any knowledge of whether Heather had
18    any conversations with her regarding any of these
19    issues?
20 A. No, I do not.
21 Q. Who's Len Waddell? Do you know who Len Waddell
22    is?
23 A. Yes.
24 Q. Who is he?
25 A. The lawyer.

1 Q. That was the lawyer that you referenced calling?
2 A. Correct.
3 Q. Other than the phone call or phone calls you made
4    to Len around the time of the repossession --
5    could we go off the record for one second?
6         (Discussion off the record)
7 Q. Other than the telephone call or calls you made to
8    Mr. Waddell around the time the repossession over
9    Memorial Day weekend, did you have any other
10    conversations with him?
11 A. I did not. I know Heather has, but I don't know
12    what they did.
13 Q. That's fine. And who is Brad Miller?
14 A. That is a friend I borrowed money from.
15 Q. Personal friend?
16 A. Yes.
17 Q. How long have you known Mr. Miller?
18 A. About eight years, nine years.
19 Q. Did you guys -- were you coworkers or --
20 A. No.
21 Q. -- high school friends or --
22 A. No.
23 Q. Other than asking Mr. Miller to borrow some money
24    like we talked about earlier, did you have any
25    discussions with him regarding any of these

1    issues?
2 A. No.
3 Q. Do you know whether Heather did?
4 A. I believe not.
5 Q. Do you know what kind of cell phone Heather has or
6    had at this time in -- well, strike that. What
7    kind of cell phone does Heather have; do you know?
8 A. Like flip phones, Smartphone?
9 Q. Yeah, right.
10 A. Now or at the time?
11 Q. I'll ask at the time, if you remember, and at the
12    time being the time of these telephone calls from
13    Santander.
14 A. I think it was like one of those -- kind of like a
15    cell phone but not, you know, when they're using
16    the -- Verizon had their little data -- it's their
17    own little data sites you could do.
18        I don't think it was like a true Smartphone
19    at the time. It was more or less when they first
20    started rolling out. Some of them, they weren't
21    like a true-true Smartphone like they are now.
22 Q. Did you and Heether have the same model or type of
23    cell phone?
24 A. I don't know at that point. I know since we've
25    been Verizon we've had one of the same, but I'm --

1    I don't know when exactly.
2 Q. Do you know whether or not Heather's cell phone at
3    the time that the calls were coming from Santander
4    had the ability to be put onto a silent mode?
5 A. I believe -- I think like the ones -- I think you
6    just hit the power button, and it will silence the
7    call, I would guess, yes.
8 Q. So you don't know?
9 A. Right. I can't remember honestly back -- I would
10    assume.
11 Q. Mr. Nelson, have you maintained a P.O. box at all?
12 A. Do I?
13 Q. Yes.
14 A. No.
15 Q. Does your wife?
16 A. No.
17 Q. Do you know where Marshall, Wisconsin is?
18 A. Yes.
19 Q. How far is that from here?
20 A. From here?
21 Q. Approximately or -- strike that. How far is that
22    from your home?
23 A. Maybe 15 minutes, ten minutes.
24 Q. And you've never maintained or paid for a P.O. box
25    in Marshall?

Heather Nelson  vs.
Santander Consumer USA, Inc., et al.

Deposition of RAYMOND NELSON  4-12-13     Page 117

1   A. No.
2   Q. To your knowledge, has your wife?
3   A. I don't -- to my knowledge, I don't think so.
4   Q. Have you ever been convicted of a crime?
5   A. No.
6   Q. Have you ever been arrested or accused of a crime
7      involving fraud or dishonesty?
8   A. No.
9         MR. O'MEARA: Just take a quick
10     break. I think I'm probably done.
11       (A short break is taken)
12        MR. O'MEARA: I'm done.
13        MR. HANNIBAL: We have no
14    questions.
15       (Adjourned at 12:59 p.m.)
16
17
18
19
20
21
22
23
24
25

Deposition of RAYMOND NELSON  4-12-13     Page 118

1   STATE OF WISCONSIN )
                  ) ss.
2   COUNTY OF DANE     )
3      I, LYNN SCHULTZ, a Registered Professional Reporter
4   and Notary Public in and for the State of Wisconsin, do
5   hereby certify that the foregoing deposition was taken
6   before me at the offices of Verbatim Reporting, Limited,
7   Two East Mifflin Street, Suite 102, City of Madison,
8   County of Dane, and State of Wisconsin, on the 12th day
9   of April, 2013; that it was taken at the request of the
10   Defendants, upon verbal interrogatories; that it was
11   taken in shorthand by me, a competent court reporter and
12   disinterested person, approved by all parties in
13   interest and thereafter converted to typewriting using
14   computer-aided transcription; that said deposition is a
15   true record of the deponent's testimony; that the
16   appearances were as shown on Page 3 of the deposition;
17   that the deposition was taken pursuant to subpoena; that
18   said RAYMOND NELSON, before examination, was sworn by me
19   to testify the truth, the whole truth, and nothing but
20   the truth relative to said cause.
21      Dated April 19, 2013.
22
23          Registered Professional Reporter
           Notary Public, State of Wisconsin
24
25

Heather Nelson vs.
Santander Consumer USA, Inc., et al.

**$**

**$1,400 (1)**
101:2
**$400 (2)**
28:22,23
**$611 (1)**
35:1

**A**

**ability (3)**
5:6,9;116:4
**able (5)**
34:14;81:21,23;93:21;
99:13
**Absolutely (1)**
81:20
**abuse (1)**
82:5
**access (1)**
37:10
**account (18)**
17:6,8,10,13;18:20;
19:2,6,20;1,2;24:3;25:20,
25;26:3,4,13,14;37:8,13
**account's (2)**
25:23;26:6
**accurate (1)**
91:12
**accused (1)**
117:6
**act (1)**
90:19
**actual (1)**
44:13
**Actually (2)**
82:16;96:25
**addition (2)**
60:15;106:17
**address (5)**
7:9;22:3;23:3,7,14
**Adjourned (1)**
117:15
**adult (1)**
57:14
**adults (1)**
71:6
**advice (1)**
80:16
**affect (3)**
5:9;56:2;78:16
**affected (12)**
58:17,21;62:2;75:6;
76:20,21;79:17,18;
106:18,24;107:5,9
**affecting (1)**
80:22
**again (2)**
24:21;54:18;65:4;79:7
**agency (1)**
90:13

**agent (4)**
90:18;94:19,24;106:4
**ages (1)**
8:1
**ago (4)**
30:5,13;55:4;106:12
**Agrace (3)**
10:13;11:2;12:10
**agree (1)**
63:7
**agreed (1)**
71:6
**ahead (38)**
17:19;19:16;20:19;
29:5,18;30:11;33:8,18;
34:1;35:21;40:23;48:7;
52:2,17;53:23;55:9;56:5;
58:20;68:1;69:1;75:9;
77:24;78:13,19;79:20;
80:3,19;81:4;90:21;94:6;
100:15;102:16;106:7;
107:2,16,24;109:8,18
**ahold (1)**
96:20
**alcohol (2)**
82:6,7
**allegedly (1)**
40:4;41:8
**allotted (1)**
27:7
**allow (1)**
46:16
**allowed (1)**
93:23
**almost (8)**
63:4,4,5;68:13;69:13,
14;103:11;108:3
**along (10)**
63:4;73:5,6,8;75:25;
76:1,4,16;77:11,22
**altercation (1)**
94:23
**although (1)**
16:15
**amount (9)**
18:4;27:24;28:19;
100:17,25;101:3,10,12;
106:12
**and/or (4)**
79:18;81:15,18;106:15
**Andrea (1)**
111:4,15,21;112:17
**angry (2)**
94:16,17
**answered (4)**
29:18;33:18;34:1;
106:7
**anymore (4)**
59:14,15,24;76:22
**apart (1)**
103:7
**apologize (1)**
83:1

**approach (2)**
28:21;73:23
**approached (2)**
38:18;74:9
**appropriate (1)**
91:22
**Approximate (7)**
16:6;41:3;42:15,17;
53:7;74:16;78:23
**Approximately (5)**
7:12;8:25;54:9;91:11;
116:21
**approximation (1)**
46:11
**area (3)**
47:22;82:20;107:8
**areas (1)**
10:18
**argue (3)**
69:5;70:11;93:8
**arguing (12)**
63:1;68:14,18,19,20;
70:1,2,13;75:24;85:20;
91:7;93:9
**argument (3)**
62:22;70:3;94:18
**arguments (3)**
62:19,20;68:22
**around (12)**
58:5;65:15,23;68:22;
69:17,17;71:18;77:22;
95:10;96:12;114:4,8
**arrested (1)**
117:6
**arrived (2)**
89:14;92:17
**arriving (1)**
16:5
**aside (1)**
96:6
**asleep (6)**
61:4;83:23;85:4,13;
87:14;95:5
**assisted (3)**
10:24;11:8,22
**assume (2)**
4:24;116:10
**assuming (3)**
111:12,13,18
**attempt (1)**
107:20
**attempted (2)**
41:17;107:13
**attention (4)**
51:5;55:5;66:15;80:11
**attorneys (1)**
38:9
**attorney's (1)**
4:15
**attribute (2)**
71:9;107:10
**audible (1)**
102:12

**Austin (1)**
8:10
**Austin's (1)**
24:16
**authority (1)**
103:19
**authorized (1)**
37:9
**automobiles (2)**
12:8;13:8
**Autumn (1)**
8:8
**Autumn's (1)**
24:16
**aware (5)**
23:1;37:22;38:25;39:3,
8
**away (2)**
84:21;96:12
**awhile (3)**
30:5;60:19,20
**awoken (1)**
86:18

**B**

**back (28)**
13:2;30:14;41:7;59:6,
7;61:24;79:5,14;89:18;
90:23;91:8;92:3,5;94:10,
20,25;95:15,21;96:1,2,5;
100:11;102:3,9,14;
104:17;112:17;116:9
**backed (3)**
92:2,4;95:1
**background (3)**
51:1,16;52:12
**backing (3)**
86:15,21,23
**bad (2)**
24:17;83:17
**Badgley (1)**
110:17
**balance (4)**
35:1,2,9,13
**bank (7)**
18:19;19:5,10,11,14,
20,21
**banks (1)**
19:3
**barrier (1)**
86:2
**base (1)**
40:11
**based (1)**
101:9
**basically (14)**
10:16;52:13;59:20;
61:13;63:17;68:8;70:21;
72:13;76:13;79:4;93:2;
96:14;97:24;103:14
**basis (5)**
36:11;40:11;50:8;

**64:**10;76:6
**basket (1)**
107:11
**Bates (1)**
33:12
**bathroom (1)**
54:2
**bed (3)**
95:15;96:1,2
**bedroom (2)**
72:11,12
**bedrooms (2)**
72:9,15
**beepers (1)**
86:23
**began (1)**
42:13
**beginning (1)**
42:25
**behalf (1)**
10:8
**behind (4)**
29:3;65:6;71:13,14
**belief (1)**
97:13
**believing (1)**
63:18
**belongings (1)**
93:22
**below (1)**
34:6
**besides (1)**
8:20
**best (2)**
30:13;89:10
**better (1)**
15:3
**beyond (1)**
32:18
**bickering (3)**
91:8;94:20,20
**big (2)**
40:8;81:8
**bill (23)**
21:12,15;22:13;27:9,9,
11,15,17,19;28:2,3,5,12;
29:11,14;32:23;33:5;
34:25;35:6,10,18;36:11;
37:15
**bills (44)**
20:9,10,11,16,21;21:2,
4,9,18,21;22:1,7,7,8,8,8,
11,16,21,23;23:5,14;28:1,
16,22;29:2;32:15,20;
34:23;35:13,23,24;36:1;
64:14,17;65:11,25;71:14;
78:1,11,11,11;104:11,12,13
**bit (10)**
28:18;37:22;40:6;
43:24;44:3;46:10;57:8;
60:14;79:15;83:24
**blank (1)**
32:21

Heather Nelson vs.
Santander Consumer USA, Inc., et al.

Deposition of RAYMOND NELSON
April 12, 2013

blue (1)
  27:20
borrow (5)
  101:20,22;102:9,10;
  114:23
borrowed (2)
  101:21;114:14
borrowing (1)
  102:5
Both (13)
  6:6:13:9,12:15:16,21;
  25:21;43:20;61:7;71:6;
  77:15;85:25;90:25;
  104:22
bother (1)
  98:13
bottom (1)
  32:5
Bowl (1)
  9:4
box (2)
  116:11,24
Boy (1)
  8:4
Boys (1)
  8:3
boy's (1)
  24:24
Brad (2)
  101:25;114:13
break (11)
  5:2,3;54:2,5;63:5;
  69:13;70:22;79:11,12;
  117:10,11
breakdown (1)
  33:13
Brennan (1)
  113:1
briefly (3)
  4:16;6:9;8:22
brought (5)
  31:18;64:18,23;66:6;
  89:10
bugging (1)
  57:20
building (3)
  9:5:12:19,24
Burling (3)
  112:10,12,21
button (1)
  116:6

              C

cable (1)
  20:16;22:8
call (27)
  44:4,6,23;45:19;46:25;
  47:3,13,23;51:18,21,24;
  52:23;55:18;57:3,7;
  67:18;69:11;82:21;
  84:14;88:21;92:14;
  96:16;97:9:100:8;114:3,

7:116:7
called (21)
  4:2;33:4,4;41:25;43:4;
  44:16;46:19;47:10,20;
  54:17;82:12,17,18,19;
  88:4,7,20;92:7;96:20;
  97:8;99:18
calling (19)
  26:8;32:18;33:3;34:20;
  42:24;43:9,14;57:8,23,
  24;58:5,12;71:17;78:10;
  84:17;92:9;96:21,22;
  114:1
calls (66)
  34:21;36:8;40:3;41:8,
  9;42:3,5,7,19;43:22;44:6,
  21;45:4,13;46:7,11;47:3,
  6,21;48:2,4,11,16;50:10,
  22;52:9,19;53:22;54:7,
  10,15;55:5,7,25;56:2;
  57:21;58:16,17;59:1;
  61:23;62:2;75:24;76:21;
  79:17;81:14;82:14;83:2;
  99:16,25;100:1;106:14;
  107:6;108:17;109:5,23,
  110:1;111:21,23,24,25;
  112:4,7;114:3,7;115:12;
  116:3
came (17)
  16:7,9;42:6;44:21,24;
  62:6,18,25;69:25;70:21;
  85:18;89:7;91:10;95:24;
  103:13,15;105:21
can (28)
  4:21;5:3,7:9;8:22;
  11:17;18:1;23:10,10;
  28:17,23;29:5,8;30:13;
  37:20;43:25;45:17;51:3;
  54:3;56:15;69:7;78:20;
  79:7;87:15;91:9;94:7;
  99:18;109:22,22
car (19)
  12:14;14:17;15:4,7,14,
  20;20:13;39:19,23,25;
  40:4,12;41:1;90:10;
  91:16;93:22;101:13;
  102:9;103:19
card (17)
  18:8,10,13,15,17,22,24,
  25;19:2,5,12;20:1,2,6;
  21:16;96:13;101:17
Care (18)
  10:13,23;11:3,16,25;
  12:5,11,22;13:4,5,6;
  22:15;28:2;81:19,23;
  112:16,19,20
carrier (2)
  25:15,18
cars (3)
  13:19;14:14,15
case (8)
  4:13;21:24;30:1,22;
  48:22;74:25;75:2;96:13

Cash (3)
  101:17,18,19
caveat (1)
  33:2
cell (45)
  23:16,18,20,24;24:1,4,
  5,7,8,14,25;25:6,11,15,
  17;26:2,8,25;27:9;29:14,
  23;30:17,19,23;31:3,10,
  15;32:24,24;33:16,23;
  34:3;35:6,10,14,15;36:2;
  51:24;52:23;53:22;115:5,
  7,15,23:116:2
center (1)
  11:8
centers (1)
  10:24
certifications (1)
  8:19
chain (1)
  91:21
chair (1)
  72:24
changed (1)
  67:23
charges (2)
  27:1;33:13
check (4)
  16:25;17:16;28:7;
  101:17
checking (8)
  17:6,8,10,13;18:19;
  19:6;20:1,2
children (8)
  7:22,24:24:8;77:14;
  78:16;81:19;95:5;99:10
children's (1)
  24:14
choice (1)
  37:18
Chrysler (1)
  13:15
Cindy (2)
  108:25;109:4
circumstances (1)
  104:16
claimed (3)
  43:9;60:8,9
clear (3)
  32:13;75:22;87:21
close (4)
  79:16;91:2;93:2;94:24
closed (2)
  87:7,8
collection (1)
  36:8
collectors (2)
  71:17;78:10
college (1)
  8:15
Columbus (2)
  7:10;22:9
comfortable (2)

13:10;32:2
coming (6)
  16:20;81:14;86:5;
  97:23;105:11;116:3
comment (2)
  45:21,24
comments (1)
  53:12
communicate (2)
  62:16;101:8
communicated (1)
  101:6
communicating (6)
  63:3;64:21;67:21,24;
  68:2;70:13
communication (1)
  68:12
communications (2)
  67:22;68:6
company (14)
  30:24,25;39:23;40:1,4,
  12;41:2;45:22,25;57:5;
  64:11;90:13,16;101:4
compiling (1)
  44:13
complaint (2)
  38:4,6
comprehend (1)
  83:24
computer (1)
  11:21
conclusion (1)
  65:10
condition (3)
  102:13;109:6,24
conference (1)
  47:13
conferenced (1)
  47:12
confide (2)
  73:12;80:16
confided (2)
  80:24;111:14
confident (1)
  81:8
confirmed (1)
  66:3
connect (1)
  34:14
consistent (1)
  37:4
content (2)
  49:14,16
contents (1)
  54:18
continuously (1)
  7:13
conversating (1)
  50:23
conversation (18)
  45:20;46:2;49:1;50:4;
  52:8;71:6;83:25;84:22;
  86:6;87:1,3,15,22;88:24;

89:15;96:25;97:3;98:11
conversations (25)
  6:4;39:5;47:17;49:6,
  17,18;51:9,12,25;52:14;
  54:6,19,23;56:7;57:15;
  61:10;99:21;108:16;
  109:4;112:20;113:4,8,14,
  18;114:10
convicted (1)
  117:4
copies (2)
  64:13,16
cops (3)
  88:21;96:11;105:10
copy (7)
  18:24;19:1;22:24;38:1,
  4,6:44:9
Corp (3)
  9:11,13,16
Corporation (1)
  8:25
corporations (1)
  9:24
Cottage (1)
  90:16
couch (12)
  72:24,25;74:3,10,13,
  21;83:21;85:3,4,8,13,15
counsel (1)
  5:18
counseling (2)
  80:13;82:1
counselor (2)
  80:6,6
counter (1)
  81:7
Country (2)
  13:15;14:4
couple (12)
  11:12;13:2,30:13;
  31:18;66:12;68:17,17;
  83:5;92:16;93:25;103:4,4
court (2)
  4:18,21
coverage (1)
  30:16
covered (2)
  4:15;106:21
coworker (8)
  112:13,14,14,18;113:2,
  3,11,12
coworkers (3)
  111:10,19;114:19
cracked (1)
  87:10
credit (4)
  18:8,10,13,15
crime (2)
  117:4,6
crying (3)
  75:11;94:15;95:17
curiosity (1)
  27:22

Heather Nelson vs.
Santander Consumer USA, Inc., et al.

Deposition of RAYMOND NELSON
April 12, 2013

current (4)
  9:14;14:24;66:7;97:13
currently (1)
  16:2

**D**

daily (1)
  81:24
damage (1)
  93:15
damages (1)
  102:17
dark (3)
  78:24,25;90:3
darker (1)
  93:7
data (3)
  34:14;115:16,17
date (12)
  16:6;42:18;44:16;53:7;
  55:16;59:16;60:9;61:20;
  69:19;74:16;97:14,19
dates (1)
  46:3
daughter (3)
  79:1;95:7;103:24
daughter's (4)
  24:17;33:21;34:3;
  79:14
day (29)
  68:6,10,16,17;70:1;
  78:20;81:21;82:16;83:7,
  11,13,15,19;99:3;100:20,
  23;102:20,24;104:4,25;
  105:4,4,5;106:20;107:7,
  14,15,21;114:9
dead (2)
  83:23;87:14
deal (4)
  59:14,15,20,23
debit (12)
  18:17,22,24,25;19:2,5,
  12;20:1,2,6;21:16;101:17
debt (2)
  71:17;78:9
decided (1)
  63:7
default (2)
  68:24;69:4
defendant (1)
  5:16
definitely (1)
  82:7
Deliver (2)
  9:22;10:8
Delivery (3)
  9:14,21;10:3
demeanor (2)
  75:16;90:18
Demonstrating (3)
  91:4;93:4;95:12
department (2)

11:19;88:5
departments (1)
  11:18
depending (1)
  28:18
depends (1)
  36:6
deposed (1)
  4:11
deposition (5)
  5:21,24;6:25;7:2;13:24
described (1)
  80:22
detail (2)
  34:22;57:18
detailed (1)
  32:18;33:3;34:20
details (6)
  39:20,21;50:4,17;
  52:14;98:16
determine (2)
  44:2;67:18
Diane (3)
  112:10,12,21
different (10)
  10:16;11:18;12:11,15,
  17,17,18;17:25;26:11;
  56:6
diffuses (1)
  89:12
diploma (1)
  8:20
direct (1)
  88:24
direction (1)
  105:12
directly (1)
  101:8
disagreements (1)
  85:9
discuss (11)
  22:16,19;35:8,12,24;
  36:15;52:19;54:10;77:10,
  19;97:9
discussed (3)
  28:1;108:13;110:24
discussing (1)
  54:6
discussion (5)
  50:3;71:4;75:4;98:16;
  114:6
discussions (6)
  35:16;70:18;109:21;
  111:6;112:24;114:25
dishonesty (1)
  117:7
disorderly (1)
  93:10
distance (2)
  44:19;91:12
doctor (3)
  79:25;80:5,5
document (3)

6:18,19,21
documents (3)
  6:12;40:20,21
Dodge (2)
  13:17;14:1
done (9)
  16:23;21:3;29:9;37:20;
  45:19;97:4;108:4;117:10,
  12
door (1)
  84:22
doors (1)
  87:7
door's (1)
  87:8
doubt (2)
  65:13,15
doubts (3)
  66:20,23,25
down (16)
  4:18;43:25;44:12,16,
  18,23;46:4;55:16,17,24;
  56:11;62:6;65:2;70:21;
  79:4;104:19
down-to-earth (1)
  94:10
draw (1)
  65:10
drive (2)
  12:20,23
driver (1)
  9:14
driveway (9)
  86:15,22;91:24,25;
  92:2,4;95:11,20;106:2
drugs (3)
  81:2,7;82:3
due (4)
  29:3;35:9,13;85:8
duly (1)
  4:2
during (13)
  6:12;46:2;50:10;51:11,
  18,24;81:2,11,13,17;
  82:14;83:1;94:3
dusk (1)
  84:10

**E**

earlier (3)
  76:15;95:8;114:24
early (3)
  78:22,24;96:17
Edison (2)
  9:11,13
effect (1)
  106:13
eight (1)
  114:18
either (11)
  29:13;36:2;46:15;
  64:22;70:9;82:5,8,10;

84:6;106:14;108:17
either/or (1)
  43:18
electric (1)
  20:16
electronically (2)
  22:23;23:14
elevated (1)
  94:21
else (27)
  6:23;8:20;13:19;29:3;
  49:11;53:24;55:14;57:4;
  66:24;70:11;71:10;73:25,
  25;74:11;75:5;76:17,19;
  77:12,14;79:16;94:3,8;
  100:8;102:11;105:13;
  106:17;109:11
e-mail (7)
  22:24;23:3,5,7,10,11,
  14
e-mails (1)
  77:7
emotional (2)
  109:6,24
employed (3)
  11:14;13:1,3
employer (2)
  10:5,6
employment (1)
  8:22
end (3)
  43:1;72:6;98:20
ended (1)
  98:21
engaged (1)
  89:7
enjoy (1)
  99:14
enough (1)
  35:17
escalated (1)
  88:18
especially (1)
  91:3
even (3)
  48:11;87:12;96:17
Eventually (1)
  36:4
exact (6)
  42:14;59:16;61:12;
  65:18;66:16;100:25
exactly (13)
  21:20;30:5;43:11;
  52:10;57:22;65:8,21;
  67:11;69:18;84:5;87:24;
  103:3;116:1
EXAMINATION (1)
  4:4
example (2)
  97:17;111:13
examples (1)
  31:18
exceeded (1)

26:25
excess (1)
  27:1
excuse (7)
  25:24;33:11;43:17;
  85:7;91:17;96:9;112:11
Exhibit (5)
  31:19;22;32:14;36:21,
  24
experiencing (1)
  59:18
explain (2)
  10:15;18:2
explained (2)
  33:2;50:1
express (1)
  97:12
expressed (1)
  97:14
eye (1)
  94:13

**F**

face (6)
  54:25;56:11;75:17;
  79:4;91:3,11
facility (1)
  113:2
fact (4)
  16:12;52:3,5;64:10
fair (2)
  50:6;106:12
fail (1)
  85:4
falling (1)
  61:4
familiar (1)
  24:12
family (16)
  13:13;14:17;31:1;
  34:17;38:11,22,25;73:7,
  14,22,23;77:15,16,17;
  80:16;97:23
fan (1)
  81:9
far (26)
  5:23;24:2;26:21;27:24;
  35:14;36:6;40:7;45:22;
  50:23;51:19;55:20;59:5;
  64:5;68:2;75:10,11,20;
  81:10;89:18;94:13;98:9,
  15;102:17;105:14;
  116:19,21
father-in-law (1)
  108:5
feel (1)
  71:2
feeling (1)
  56:17
fell (1)
  85:13
felt (2)

Heather Nelson vs.
Santander Consumer USA, Inc., et al.

Deposition of RAYMOND NELSON
April 12, 2013

30:16;59:7

few (11)
16:23;17:24;20:23;
30:2,14;41:4;48:21;
69:24;71:24;86:2;93:23

figure (8)
44:1,2;45:15,17;46:13;
56:21;86:2;89:18

filed (4)
37:22;38:2;41:13;42:7

finally (2)
84:16;88:2

financed (1)
14:15

financial (2)
21:21;29:1

fine (2)
90:22;114:13

finger (1)
54:12

finish (1)
4:21

fired (1)
59:4

first (13)
4:2;11:4;32:13;33:15;
34:25;40:21;58:4;65:15;
66:17;90:22;95:7;
104:20;115:19

fit (1)
98:7

five (2)
9:12;32:14

flashlight (1)
90:4

flatbed (1)
91:19

flip (1)
115:8

focus (1)
48:14

focused (1)
50:25

folks (1)
108:25

following (2)
8:23;58:15

follows (1)
4:3

follow-up (2)
71:3;98:11

Fons (3)
5:19;6:24;7:3

food (2)
82:6,7

forehead (3)
83:22;84:24;85:22

form (35)
17:18;19:15;20:18;
21:14;29:4;30:13;37:7;
35:20;37:6;40:23;48:6;
52:1,16;56:4;58:19;
67:25;68:25;75:8;77:23;

78:12,18;79:19;80:2,18;
81:3;90:20;94:5;100:14;
102:15;106:6;107:1,24;
108:10;109:7,17

formally (1)
76:7

forth (6)
16:9;61:24;89:18;
90:23;91:8;94:21

foundation (33)
17:19;19:16;20:19;
29:5;30:11;33:8;35:21;
40:23;48:7;52:2,17;56:5;
58:20;68:1;69:1;75:9;
77:24;78:13,19;79:20;
80:3,19;81:4;90:21;94:6;
100:15;102:16;106:7;
107:2,24;108:11;109:8,
18

four (3)
26:3;32:21;33:13

frame (1)
61:18;65:14;84:8

frames (1)
69:25

fraud (1)
117:7

friend (7)
100:3,4;101:23;111:5,
15;114:14,15

friend-friend (1)
100:7

friends (11)
30:20;31:3;38:11,20;
73:7;77:17;80:16;
110:18;111:10,19;114:21

friend's (1)
101:24

front (1)
92:5

full (3)
4:8;35:6,13

further (1)
71:3

## G

garage (2)
98:7;105:23

gas (5)
20:16,23,25,25;22:7

gather (1)
43:6

gave (7)
13:2;52:3;93:11,12,13,
24;96:13

general (16)
13:2;29:7;34:13;47:22;
49:1,8,10;51:15;68:5;
69:10,12,24;77:16;94:20;
100:1;107:8

generalize (1)
31:8

generally (16)
15:1;20:8;28:1;36:14;
39:24;48:2;50:25;53:2;
57:11,14;68:22;75:1;
100:7;105:11,23,25

gentleman (1)
105:5

Georgia (1)
113:10

gets (3)
27:9;88:18;89:12

girl (2)
8:4,6

girls (1)
8:3

given (1)
4:13

gives (1)
31:13

giving (2)
16:17;30:19

God (1)
100:22

goes (6)
10:16;21:15;36:6,8;
89:11;105:5

Good (3)
4:6;98:14;111:19

Gosh (1)
30:2

grab (3)
93:23,25;94:2

grabbed (4)
89:10;92:25,25;94:1

graduate (1)
8:11

greater (1)
101:1

grounds (1)
9:3

Grove (1)
90:16

guess (13)
20:4;21:16;42:25;67:4;
85:12;86:14;87:19,21;
94:11;100:16;103:8;
108:7;116:7

guessing (5)
30:2;41:3;71:20;103:6;
111:11

guys (9)
23:9;59:6;69:14;71:13;
74:14;80:13;98:18;99:6;
114:19

## H

hand (1)
101:19

handle (6)
20:9;22:1;78:1;95:21;
104:11,12

handled (1)

104:12

handles (1)
21:21

handling (1)
79:6

Hannibal (52)
5:19;6:24;7:3;17:18;
19:15;20:18;29:4,17;
30:10;31:24;33:7,17,25;
35:20;36:23;40:22;48:6;
52:1,16;53:23;54:1;55:8;
56:4;58:19;67:25;68:25;
72:17,19;74:22;75:8;
77:23;78:12,18;79:7,19;
80:2,18;81:3;90:20;91:9;
94:5;99:20;100:14;
102:15;106:6;107:1,16,
23;108:10;109:7,17;
117:13

happen (1)
71:23

happened (4)
96:9,9;98:4;100:10

hard (1)
10:15

head (4)
4:17;11:19;24:11;
87:14

heads (1)
11:19

health (1)
81:11

healthy (1)
61:16

hear (12)
36:9;50:14;51:3,17,20,
23;56:7,9;87:3,6,8;96:25

heard (10)
31:15;51:22;52:7,7;
74:9;83:25;86:5,21;87:1;
95:9

heated (1)
88:18

Heather (93)
7:19;14:13;15:6,12,14;
16:16,21;17:6,10;18:10,
22;21:9,17;23:7;25:6;
27:10;28:2;31:12,15;
34:18;35:25;36:15;
37:23;41:9;42:20,23;
43:3,14,23;46:12;47:7,
13,20;48:1,12;50:9,14,
53:16;56:2;60:12;62:1;
67:2;76:8,20,20;77:21;
78:9;79:25;83:2;84:13;
85:1,1,16,21;86:9;87:12,
13;88:4,8;91:6,7;92:11;
96:15;99:15;100:16;
101:9;104:22;105:9,17;
108:19,21;109:13;
110:13,24;111:9,13,23,
25;112:2,23;113:8,17;

104:12

114:11;115:3,5,7,22

Heather's (16)
16:1;26:10;27:17;
33:23;37:7;50:21;96:25;
108:7;109:3,6;110:18;
111:5;112:13,14;113:11;
116:2

help (1)
76:24

Here's (4)
31:9,9,10;96:13

herself (3)
53:4;81:23;82:12

Hey (3)
28:22;74:9;97:17

high (5)
8:11,20,23,24;114:21

history (1)
8:23

hit (1)
116:6

holds (1)
40:15

home (17)
10:14;20:14;22:3,24;
27:11,13;29:21,24;30:4,
9;31:4,9,16;32:16;36:1;
48:3;116:22

homes (4)
10:1,19,22;11:22

honestly (5)
73:21;74:6;82:22,22;
116:9

hook (1)
92:2

hooked (3)
91:22;92:5;103:22

Hospice (3)
10:13;11:3;12:10

hospital (1)
10:14

hours (1)
98:21

house (12)
15:20;21:22;22:9;
47:22,23;63:9;72:9;86:6,
8;87:1;95:5;103:13

household (1)
20:9

how's (3)
68:6,11,11

HSBC (3)
102:21,22;104:1

hundred (16)
11:12;17:20;24:23;
28:6;30:3;40:25;42:21;
64:20;85:23;86:13;88:8;
90:6;97:5;101:18;103:8;
104:3

husband-wife (1)
68:5

hypothetically (1)
28:23

Heather Nelson vs.
Santander Consumer USA, Inc., et al.

**I**

idea (4)
40:9;42:17;70:16;
109:13
identification (1)
31:20
identify (1)
28:20
ignored (1)
67:14
ill (2)
10:17,21
impair (1)
5:5
impairment (1)
5:9
inappropriate (1)
91:2
inches (1)
91:11
incident (6)
68:3,8;71:24;84:13;
97:6;104:25
include (1)
20:13
included (1)
32:19
Including (1)
100:3
incoming (1)
34:20
increase (1)
82:5
incurred (1)
27:1
indicate (2)
73:24;74:11
Indicating (1)
32:7
individuals (1)
9:25
Industries (3)
9:6,7,24
information (5)
23:9;45:7,9;46:9;69:8
initiated (1)
82:15
input (1)
11:20
inside (4)
86:4;93:20,22;96:14
instances (1)
29:8
instead (1)
22:34
interjected (1)
56:12
Interpose (1)
40:22
interrupting (1)
61:17

into (15)
11:21;23:10,10;36:8;
42:22;50:25;57:18;70:9;
85:20;86:15,22;90:6;
92:2,4;96:2
involved (1)
26:14;62:23;74:17;
92:20
involving (2)
104:1;117:7
iPad (1)
34:11
iPads (1)
34:12
issue (3)
40:8,8;64:19
issued (2)
19:12;30:25
issues (14)
28:7;71:10;108:22;
109:22;110:4,11,22,25;
111:7;112:21,24;113:5,
19;115:1

**J**

job (3)
9:13;12:3,16
joint (2)
17:6;19:2

**K**

Kathy (1)
108:6
keep (3)
57:1,14;62:22
keeping (3)
44:21;57:6;94:12
key (3)
93:15,19,20
keys (2)
93:24;94:1
kids (15)
24:6;57:13,14;62:23;
68:7,9,12;71:7;73:1;76:2,
4;83:12;84:11;85:2;97:7
kid's (2)
72:12,12
kids-wise (1)
63:8
kind (12)
10:18;21:2,12;22:8;
33:9;84:21;89:12;90:3;
91:11;115:5,7,14
Kindle (1)
34:11
knew (18)
41:14;43:14;44:15;
54:13;55:11;57:5;58:9;
76:5,6,8,11;82:17;84:1;
86:9;87:11;91:20;96:21;
110:1

knowing (1)
35:25
knowledge (24)
16:10;38:21;41:10;
48:20;50:8,13;51:10;
53:18;62:11,12;69:12;
75:1;80:4,8;101:5;
105:20,20;106:10,11;
112:23,25;113:17;117:2,
3
known (2)
56:15;114:17
knows (1)
111:22

**L**

laid (2)
9:8;94:10
landline (3)
29:20;30:4,15
last (3)
34:3;72:3;106:1
late (5)
43:10;60:6;63:21;
67:19,19
later (5)
13:23;65:2;92:16;96:3;
100:22
lawsuit (22)
5:13,16;16:8,9,17;
37:21,22;38:1,8,20,22,25;
39:3,6,8,11;41:7,8,15,18;
42:6,7
lawyer (9)
6:5;45:10;74:15;99:18;
21;100:3,5;113:25;114:1
lawyers (6)
6:5,6;74:15,17,25;75:1
laying (1)
83:21
lean (1)
80:17
least (1)
72:4
leave (2)
48:19;98:25
leaving (1)
35:2
left (1)
98:21
Len (3)
113:21,21;114:4
less (9)
13:5;14:18;16:6;35:9,
12;66:2;68:11;85:18;
115:19
letter (7)
52:6,22;53:1,9,12,16,
17
letting (1)
84:23
line (3)

29:24;30:9;47:12
Liquor (2)
9:11,13
list (10)
44:4,6,12,14;45:1,3,11,
13;46:7;109:22
listed (1)
33:14
listen (8)
48:11,13;50:21;51:8;
55:6;59:8;60:1,2
listened (1)
55:11
listen-listen (1)
48:14
little (21)
10:17;28:18;37:22;
40:6;41:10;55:3;60:14,
23;61:9;66:2;71:5;79:15;
83:11,24;90:4;93:7;97:6;
104:6;106:12;115:16,17
live (1)
7:7
lived (2)
7:11,13
lives (1)
110:19
living (11)
10:24;11:8,23;51:2;
72:13,22;73:2;74:3;
76:13;84:1;95:11
loan (34)
6:21;14:14,21,22;
15:14;16:2,3,11,22;
17:15;18:4;39:23;40:1,4,
12,20,21,21;41:2;43:16;
45:22,25;57:5;63:21;
66:1,7;67:3;68:21,23;
69:4,8;70:4,4,6
loans (12)
14:10,12,24;15:4,20;
16:17;20:13;39:19;40:16,
18;41:2;70:10
locations (2)
12:17,18
log (1)
44:4
log-in (1)
23:9
logs (1)
57:7
long (19)
7:11,20;9:7,17;11:2,11;
21:24;25:17;30:1,5;41:1,
3;56:15;60:18,21;66:16;
72:3;75:15;114:17
look (11)
27:20,24;31:21,24;
34:25;36:24;53:8;66:10;
89:24;92:22;93:3
looked (5)
53:2;65:5,11;66:21;
105:12

looking (1)
32:2
lot (9)
59:3;60:22;61:1;62:7,
16;67:22;68:15,16;86:22
Lots (1)
56:6
low (1)
72:6
lying (2)
64:8;85:3

**M**

mail (12)
15:24;16:25;18:6;22:3,
4,5;33:10;47:1;48:19,25;
49:1,11
mails (4)
48:23;49:3,7,17
maintained (3)
44:6;116:11,24
Maintenance (1)
9:3
majority (1)
48:4
makes (3)
15:4;26:11;76:10
making (9)
12:5;16:21;35:8;45:13;
63:18;67:3;83:11;99:16,
24
manager (1)
9:5
managing (1)
26:14
manner (1)
20:22
many (14)
7:24;43:22;46:11;49:3;
54:9;55:1;56:1;56:18,20,21,
22,25;62:13;72:9;112:4
marked (3)
31:19,21;36:21
marriage (5)
73:24;80:13;81:18;
109:24;110:1
married (3)
7:16,20;21:25
Marshall (2)
116:17,25
master (2)
72:11,12
matter (1)
20:12
may (15)
5:9;28:21;30:8,22;
46:11;48:24;50:9,9,18,
18;51:10,12;79:17,18;
91:2
Maybe (13)
14:19;15:3;21:16;
48:21;60:23;67:4,6;

(5) idea - Maybe

Heather Nelson vs.
Santander Consumer USA, Inc., et al.

Deposition of RAYMOND NELSON
April 12, 2013

70:16,21;71:24;92:16;
103:6;116:23
McKesson (1)
9:16
mean (61)
14:7,20;15:9;18:2,6;
20:25;36:6;38:24;40:6;
41:21;48:15;51:1,7,8;
53:2;54:25;55:2;56:6,22;
58:9;59:22,23;60:21,22,
22,23;61:3,5,14,22;62:15,
21,25;63:2,13;64:21;
66:2,3,15;69:6,10,14;
70:8;72:6;73:22;75:12,
20,22;76:7;77:2;80:5;
86:19;88:4;89:23;90:4,4;
93:7,8,24;103:14;105:14
meaning (4)
36:19,19;49:20;53:14
means (1)
12:14
medical (5)
9:16,22;80:5,10;81:10
medication (2)
5:5;11:20
medications (1)
12:6
medicine (1)
81:9
meet (2)
5:24;6:4
meeting (1)
22:19
member (2)
73:14,23
members (4)
38:11,22,25;77:17
Memorial (16)
83:11,13,15,19;100:20,
23;102:20,24;104:25;
105:4;106:20;107:7,14,
15,21;114:9
memory (1)
79:23
mental (1)
81:11
mention (2)
54:17,20
mentioned (17)
14:7,21;37:12;48:24;
49:9;58:14;60:15;62:3;
67:21;69:13;71:22;
78:15;83:5;92:24;98:1;
112:2,3
mentioning (1)
79:13
message (1)
48:25
messages (4)
47:1;48:19,20;49:12
met (2)
6:23;112:22
meters (2)

79:8,9
middle (2)
43:1;61:4
might (5)
36:9;45:24;77:1;87:22;
88:4
Miller (6)
102:2,3,5;114:13,17,23
Milwaukee (5)
84:11;96:24;98:20;
99:2,6
mind (4)
91:13;94:8;99:13;
104:4
mine (7)
19:1,7;26:1;33:19;
37:19;70:17;82:24
minimum (1)
62:22
minivan (4)
13:16;14:4;99:8;105:2
minute (1)
92:16
minutes (11)
26:17,18,20,21;27:1,7;
86:2;92:16;93:25;116:23,
23
mischaracterizes (2)
55:9;72:20
mode (1)
116:4
model (1)
115:22
mom (2)
99:11;109:3
moment (3)
86:9;94:2;95:19
money (21)
15:10,12;16:23;17:25;
18:1,2,3;21:17,19;28:12,
14,16,21;35:18;77:21;
100:18;102:6,9,10;
114:14,23
month (14)
28:24;36:12;37:5;
60:20,22,23;65:3,7,7,8;
66:12;69:20,22,24
monthly (20)
15:18,19;16:3,11;
21:17;22:7,19;26:17;
27:13;28:16;29:2;32:15,
36:11;37:3,4
months (7)
69:22;72:4,5,6;103:4,6,
7
moon (1)
27:20
more (23)
10:17;12:2;13:5;14:18;
16:6;41:4,11;42:25;
59:21;60:23;66:2,3;
68:11;72:5;79:21,23;

85:18;94:10,11;107:3,6,
9;115:19
morning (7)
4:6;6:9,9;78:23;82:17;
83:10;98:5
mortgage (2)
20:14;36:1
Most (4)
15:8;9:16;15:99:15
mother (6)
84:19;96:23;97:1;98:1,
13;109:20
Mother-in-law (2)
109:1,2
Motion (2)
9:6,7
mouth (1)
87:5
move (1)
37:20
moved (1)
98:18
much (13)
21:25;22:14;27:10,10;
32:1,3;45:22;68:8,20;
69:17;70:13;88:9;100:24
muffling (1)
87:6
Munz (1)
8:24
museum (1)
84:12
must (2)
95:23;100:16
myself (2)
83:1;84:21

### N

name (23)
4:6,8;6:21;7:18;8:7,9;
9:16;14:9,10,12;25:23,
25;26:6;27:15,17;37:7,9,
11,15;45:21;69:6;90:15;
101:24
narrow (1)
43:25
natural (1)
20:25
necessarily (1)
36:13
necessary (1)
53:16
need (9)
4:17;10:23;19:25;20:2;
25:8;28:22;30:16;61:14;
62:24
needs (2)
4:18;28:20
neighbors (3)
90:25;94:11;95:2
NELSON (22)
4:1,6,10,11;5:14;7:5,

19;8:11;23:16;29:20;
31:22;34:19;35:23;
36:22;45:11;54:6;55:4;
79:13;109:15;110:7,9;
116:11
new (1)
9:16
next (3)
86:17;96:9;99:23
Nicole (1)
110:17
niece (5)
84:19;96:23;97:1;98:1;
99:11
night (3)
59:3;61:5;86:20
nine (1)
114:18
Nobody (1)
74:9
nods (1)
4:17
nonstop (2)
57:20;63:1
normally (1)
92:14
Nos (1)
31:19
notepad (4)
44:20,22;46:5,5
notes (2)
46:4;77:3
number (23)
23:18,22;24:10,12,20;
30:18,19,23;31:3,5,10,13,
16;32:10;33:15,16,21;
34:6,10,13;51:18,21;
96:13
numbers (8)
24:7,18;26:3;32:5,5;
33:4,14;55:16
numerous (10)
54:12,20;56:10,19,22;
57:1;72:4,4;95:16;99:5
nurse (3)
10:25;11:9,24
nursing (3)
10:1,14;11:8

### O

Oakwood (6)
11:6,7,9,14;12:16;13:4
oath (1)
4:3
object (1)
74:23
Objection (39)
17:18;19:15;20:18;
29:4,17;30:10;33:7,17,
25;35:20;40:23;48:6;
52:1,16;55:8;56:4;58:19;
67:25;68:25;72:20;75:8;

77:23;78:12,18;79:19;
80:2,18;81:3;90:20;
91:15;94:5;100:14;
102:15;106:6;107:1,23;
108:10;109:7,17
observe (1)
44:18;89:14;94:3
observed (5)
59:12,13;62:1;103:25;
106:13
observing (2)
46:4;86:4
obviously (12)
41:11;51:3;60:5;61:25;
84:2;86:13;88:20;89:20;
93:16;98:22;104:17;
110:1
occasion (1)
22:13
occurred (3)
64:4;85:7,10
occurring (1)
95:3
off (13)
9:8;18:4,6;24:11;
49:24;50:1;52:25;53:4;
67:15;75:3,4;114:5,6
officer (5)
89:3,4,9;93:14,18
old (2)
7:5;70:2
Olson (4)
108:4,6,25;109:4
O'Meara (4)
4:5,7;32:1;36:25;54:3;
75:3;79:10;91:14;117:9,
12
Once (8)
21:19;22:14;27:20;
49:9;66:18;87:15;
102:22;112:22
one (48)
6:14;11:19;12:12;
17:11;24:6,14;26:10,12;
32:7;33:20;34:3,6;43:19;
51:2;54:3;55:15,23,24;
59:13;65:5;69:6;70:9;
72:8,14;74:15;77:14;
78:6;82:16,23;90:16,24;
91:1,19;92:14,15,17;
99:17;100:6;104:1,16,19;
107:9,11;110:18;113:11;
114:5;115:14,25
ones (4)
32:22;65:6;77:20;
116:5
online (5)
20:24;21:3,4,12,15
only (13)
31:18;35:18;43:5;50:6;
52:21;55:25;58:2;69:7;
70:3;78:20;83:8;93:23;
112:22

(6) McKesson - only

Heather Nelson vs.
Santander Consumer USA, Inc., et al.

Deposition of RAYMOND NELSON
April 12, 2013

onto (1)
  116:4
open (11)
  15:23,24;22:11,13,14;
  25:20;27:19,20,22;84:16;
  96:18
opened (4)
  25:21;37:13;84:17;
  96:19
opening (1)
  26:13
opens (1)
  27:10
opinion (2)
  63:16;64:1
ordeal (2)
  61:21,22
order (8)
  17:25;18:1,2,3;20:1;
  59:9;89:20,22
orders (1)
  16:24
out (33)
  11:22;12:6;13:11;
  30:18,19,20;31:3,13;
  45:15,17;57:12,14;63:9;
  64:11;69:3;70:23;78:25;
  79:8,16;83:10;84:11;
  86:3,5;89:8,19;90:3;
  91:22;93:7;94:8;95:9;
  99:5,13;115:20
outgoing (1)
  34:21
outside (19)
  78:22;83:22;84:4;
  85:25;86:1,6,12,25;87:2,
  4,13,13,16;88:25;89:7;
  95:3,19,23;103:21
outstanding (3)
  68:24;69:4;104:9
over (21)
  26:20,21;27:5,6,7;53:2;
  60:22;65:5;67:2,7,16;
  75:13,20;81:6;83:13;
  99:4;100:20;102:20;
  106:19;107:6;114:8
overdue (2)
  36:2;78:11
overnight (2)
  99:2,3
over-over (1)
  26:24
own (18)
  10:2;13:7,12;14:7;
  17:8,10;18:13,15,25;
  19:1;21:8,9;22:1;23:16,
  24;39:17;69:4;115:17

P

pad (2)
  55:15,21
page (2)

paid (17)
  16:22;17:15,16;21:4,
  12;29:11;35:24;36:12,12;
  64:24;65:11,25;68:21,23;
  100:18;104:19;116:24
paper (1)
  22:24
paperwork (13)
  64:23;65:12,66:6,11,
  22;87:20;89:2,9,23;
  92:22;93:1,5;103:17
parked (1)
  105:23
parse (1)
  13:10
part (10)
  12:16;15:8,9;25:9;
  32:15;41:8,14,18,21;
  99:15
partial (2)
  35:8,19
partially (1)
  36:11
participate (2)
  47:6;48:12
parties (1)
  92:20
patients (5)
  10:19;12:2,4,11,18
pay (18)
  15:14;20:11;21:8,9,10,
  15;35:5,18,23;55:5;
  64:20;66:15;100:17,18,
  24;101:12,17;102:3
paying (7)
  22:16;28:22;35:9,12;
  51:5;62:7;63:16
payment (6)
  21:14;24:5;28:3;35:19;
  43:15;64:7
payments (29)
  15:4,7,14;16:17,21,22;
  17:15,23,25;18:8;21:22;
  22:21;35:1,9;43:4,7,10;
  60:9;63:18,20;64:17;
  67:3,16,19;78:2;90:10;
  97:13,19;104:9
payment-wise (1)
  43:2
pays (5)
  20:9,10,17,21;28:5
pen (1)
  46:1
people (9)
  10:17;11:22;12:5,5;
  31:13;51:3;90:14,22;
  93:11
percent (16)
  11:13;14:19;17:20;
  24:23;28:6;30:3;40:25;

64:20;85:23;86:14;88:8;
  90:6;97:5;101:18;103:8;
  104:3
period (2)
  66:10;81:14
permission (2)
  51:24;52:4
persistent (1)
  66:14
person (7)
  81:9;88:25;89:15;92:8;
  94:10;99:17,17
personal (7)
  10:7;12:7,13;25:1,7;
  93:21;114:15
Personally (17)
  13:9,12;15:22;21:5;
  38:16,23;42:22;51:7;
  62:6;64:15;69:7;74:24;
  92:10,12;93:2,3;111:17
phone (72)
  23:16,18,20;24:7,8,11,
  25;25:6,8,11,15,17;26:2,
  8,25;27:9;29:14;30:19,
  23,24,25;31:3,4,6,9,10,
  16,16;33:16,24;34:3;
  35:6,10,14,15;36:2;
  41:25;46:23,24;47:9;
  48:16;49:24;50:1,19;
  51:4,24;52:23;53:22;
  55:12,13;56:7;57:21;
  58:16;59:1;75:24;76:21;
  82:21;97:3;99:16,24;
  100:1;111:24,25;112:4,7;
  114:3,3;115:5,7,15,23;
  116:2
phones (10)
  23:24;24:1,4,5,14;
  29:23;30:17;32:24,24;
  115:8
physical (1)
  94:23
pick (1)
  87:17
picked (2)
  90:17;101:10
pickup (2)
  13:18;14:1
pile (1)
  22:15
place (3)
  18:3;83:6;113:13
placed (3)
  44:7;48:5;54:11
places (3)
  10:16;12:12,15
placing (1)
  52:20
plaintiff (1)
  5:13
plan (5)
  26:8,18,25;34:14;98:24
planned (1)

98:25
planning (1)
  99:4
plans (2)
  26:11,22
play (1)
  48:18
please (2)
  4:8,9
plug (1)
  79:8
pm (1)
  117:15
PO (2)
  116:11,24
point (27)
  6:1;43:3;49:18;57:22;
  58:2;61:12;62:6;63:2,4,
  10,12;67:16;68:13;69:25;
  85:11,15;86:25;88:15,19;
  90:24;91:1;92:13;93:7,
  11,16;98:8;115:24
points (1)
  62:25
Police (10)
  88:5;89:4,14;91:16;
  92:7,13,18;93:8,9;96:6
position (3)
  9:9,15;11:4
positive (1)
  45:12
possible (1)
  17:15
Possibly (3)
  36:10;76:25;111:10
power (1)
  116:6
practice (1)
  35:5
Prairie (5)
  7:8,10;19:11,23;88:5
pre (1)
  108:3
preparation (1)
  6:13
prepare (2)
  5:21;6:24
prescription (1)
  81:6
prescription-based (1)
  12:3
prescriptions (3)
  11:21;81:2;82:3
present (7)
  6:23;8:23;42:12;47:20;
  51:13;82:14;103:9
presented (1)
  66:11
presumably (2)
  34:4;72:11
presume (4)
  16:15;30:22;81:23;
  91:24

Pretty (14)
  13:6;21:25;27:10,10;
  32:3;44:22;45:22;54:23;
  68:8,20;69:17;70:13;
  81:5,8
previous (1)
  35:1
previously (2)
  67:23;103:10
prior (5)
  102:24;103:5,25;
  104:8;107:15
privy (1)
  54:18
probably (12)
  4:15;14:18;16:16;36:4;
  60:22;61:7;68:17;72:5;
  84:7;85:23;91:21;117:10
problems (9)
  77:10,15,19,21;85:16,
  18;108:18;109:5,24
products (1)
  10:8
proof (4)
  43:6;65:9;87:18,20
provided (1)
  10:5
pulled (3)
  84:21;91:22;96:12
purchase (1)
  14:8
purposes (1)
  31:1
put (10)
  22:15;37:19;48:16;
  54:12;59:9,11;60:21;
  71:8;99:13;116:4

Q

quarters (2)
  63:11;71:22
quick (2)
  34:25;117:9
quickly (2)
  93:6;94:2
quiet (1)
  66:24
quite (6)
  43:24;44:3;46:10;57:8;
  60:19,20

R

raising (1)
  90:24
Ram (1)
  13:17,22;14:1
rare (1)
  22:12
rather (1)
  69:5
Ray (33)

Heather Nelson vs.
Santander Consumer USA, Inc., et al.

17:19;19:16;20:19;
29:6;30:11;33:8;18;34:1;
35:21;40:24;48:7;52:2,
17;55:10;56:5;68:1;69:1;
75:9;77:24;78:13,19;
79:20;80:19;81:4;90:21;
91:10;94:6;100:15;
102:16;106:8;107:2,24;
109:8
RAYMOND (3)
4:1,10;31:22
reach (1)
46:1
reaction (1)
79:14
read (2)
38:6;56:15
real (1)
94:21
realized (2)
84:15;96:17
really (65)
14:23;15:11;16:23;
17:2,3,3,5;20:7;26:19;
36:16,17,19;39:19;40:2;
41:22;42:21;44:1;45:7;
46:13;47:8;48:8,9,10,14;
49:19,20;51:14;52:21;
53:10,13,14,15;55:4;
57:18,18,22;58:7,8,10;
60:21;62:9,16;64:20,21;
67:1,13;70:9,12,12;
75:12;77:2,19;85:19;
90:5,5;92:19,23;93:24;
94:7;97:5;100:4;103:3;
104:10;105:14;107:8
reason (15)
5:2;14:22;37:15,23;
43:5;53:21;54:21;58:2;
74:20,20,24,24;83:9;
102:5;104:7
reasons (3)
62:12;64:2;98:17
recall (32)
6:15;29:8;30:13;31:17;
32:3,19,22;38:10,13,18;
47:8;48:21;65:8;69:18;
73:11;76:22,24;78:20;
79:21,22;83:6;85:11,23;
87:19,23,23,24;90:12;
91:19;92:9;94:7;107:3
receive (6)
15:18,19;23:5;34:19;
37:5;45:18
received (9)
16:11;33:5;34:22;
46:25;47:23;48:2;111:24,
25;112:4
receives (1)
23:13
receiving (1)
16:2
recognize (6)

24:19;31:23;32:14,23;
36:22;37:2
recollection (5)
30:8;46:16;49:8;52:13;
76:24
record (7)
4:8,22;75:3,4;91:10;
145,6
recorded (3)
26:12;55:18,20
recording (1)
46:8
records (3)
32:18;33:3;34:20
refer (3)
13:22;14:3;40:12
referenced (1)
114:1
referring (10)
13:23,25;14:4;15:20;
21:1;32:13;40:13;41:12;
81:13;91:18
refers (1)
31:12
reflect (2)
91:10,12
refresh (4)
30:7;46:15;76:23;
79:23
regarding (13)
15:20;41:20;49:7;50:3;
54:7;77:7;79:16;80:17;
109:5;112:21;113:4,18;
114:25
regular (1)
32:19
reimbursed (1)
29:13
related (6)
43:4,15,16;45:13;
71:10;85:16
relates (4)
39:11,25;40:3;41:8
relationship (5)
75:6;106:15,19,25;
107:5
release (2)
101:4,13
remember (26)
6:20;15:22;49:6;53:6;
61:10,15,17;65:17,18,21;
67:10;82:23;83:7,8,9,16,
18,21;84:5;88:12;90:15;
101:1;102:11;103:2;
115:11;116:9
remembering (1)
2:4:18
remove (1)
93:21
repeating (1)
83:1
repo (34)
60:10,13,14;61:25;

62:8;64:4;65:23,24;66:4;
69:17,20,22,23;71:10;
72:1,2;75:24;76:21;
78:21;79:13;82:16,17;
85:7,9,19;88:13;97:11;
98:17,17;99:13;101:6;
106:16;109:5;110:4
repo'd (5)
58:3;59:5;60:6;63:15;
98:9
repo'ing (1)
90:11
reporter (2)
4:18,21
repos (1)
81:15
repossess (1)
106:4
repossessed (13)
58:6;65:16;96:7;97:18;
102:19,22;103:9;104:8,
24;105:3;107:13,13,14
repossessing (1)
90:9
repossession (34)
64:11;71:15;79:15;
83:4,6,19;88:7,13,25;
89:15,21,22;90:7,14,18;
94:4,19;101:3,14;102:11;
103:25;104:1,21;106:4,
14,19,24;107:6,21;
108:18;109:23;110:2;
114:4,8
repossessions (2)
41:17,17
repossessor (5)
86:9,11;92:11;93:1,14
represent (2)
31:4,15
representatives (1)
47:18
represented (1)
5:18
representing (1)
4:7
required (2)
25:2;101:4
respond (2)
105:13,17
response (3)
67:12;71:1;102:12
responsible (2)
24:1,4
restate (1)
4:23
result (1)
79:25
retrieved (1)
104:20
review (7)
6:12;22:11,13;65:1;
66:7,18;93:5
revolved (1)

68:22
rid (3)
30:6,8,15
Right (37)
12:4;19:24;23:2;32:20;
41:6;44:25;46:2;47:19;
50:10;52:11;54:4,16;
56:1;58:24;64:25;68:4;
74:12;76:8,11;77:19;
78:5;80:25;87:9;89:6;
97:16;98:12;103:16,18,
21,21;104:22;106:23;
108:2,2;111:17;115:9;
116:9
road (1)
65:2
Robert (1)
4:6
Robin (1)
113:1
rolled (1)
67:15
rolling (1)
115:20
room (16)
47:24;51:2,2;72:12,13,
13,16,18,23;72:3;74:3;
76:13;79:5;84:1;95:11;
96:2
rooms (2)
11:20;72:8
routine (1)
103:14
ruin (1)
97:6
rules (1)
4:16
run (1)
108:24

---

**S**

safe (1)
47:17
same (14)
12:23;19:5,14;26:4;
47:24;102:18;103:12,14;
108:24;111:6;113:2,3;
115:22,25
Santander (87)
4:7;40:14,15;41:1,9,23;
42:8,19,23;43:4,8,9,14,
22;44:6;45:3,14;46:11,
19;47:3,4,7,9,15,18,21;
48:2,19,25;49:4,7,18,25;
50:7,9,14,18,22;51:11,18,
20,23;52:8,15,20;53:5;
54:8,10,13,17,20;55:5,7,
14,19;56:9;57:3,6;58:4,
11,16;60:9;61:24;62:15;
67:18;69:8;70:3,10;
71:18;75:20;78:16;
79:17;80:1;81:15;82:12,

15:21;83:2;85:17;96:16;
97:8;101:5;104:2;106:3;
108:17;115:13;116:3
Saturday (6)
83:10,13,19;85:22;
102:20,24
saw (5)
44:13;45:13;57:9,17;
58:14
saying (11)
26:15;38:10;39:1;43:2;
53:3;55:6;65:6;73:11;
79:2;88:19;103:17
scanned (1)
93:6
scheduled (1)
83:10
school (5)
8:11,20,23,24;114:21
screaming (1)
94:22
screen (1)
95:20
second (4)
33:11,20;96:20;114:5
second-guessed (1)
62:9
second-guessing (1)
93:23
seconds (1)
93:23
seek (3)
80:13;81:10;82:1
send (4)
12:5;18:4,6;53:17
sense (1)
88:11
sent (5)
11:22;32:4;52:25;53:1,
4
separate (7)
17:12;18:25;19:3;
63:11;70:14,16;71:22
separated (2)
69:14;85:6
separating (2)
70:18;73:15
separation (2)
71:9;73:18
set (1)
98:23
seven (1)
72:5
several (3)
58:15;66:15;98:21
share (4)
17:22;23:9;45:6,9
sharing (1)
46:9
sheets (1)
33:9
shock (1)
97:22

(8) RAYMOND - shock

Heather Nelson  vs.
Santander Consumer USA, Inc., et al.

Deposition of RAYMOND NELSON
April 12, 2013

short (3)
    54:5;79:12;117:11
shortly (1)
    74:14
shoulder (1)
    67:15
shouting (1)
    94:18
show (11)
    33:3;34:20;36:21;44:9;
    64:13,16,23;66:6,14,18;
    92:15
showed (10)
    52:25;53:1,10,11;
    64:18;65:4;92:13,14;
    97:1;98:2
showing (2)
    88:22;96:23
shows (1)
    35:1
shush (1)
    90:25
side (1)
    37:21;50:21;52:8
signature (1)
    6:18
signed (1)
    18:5
silence (1)
    116:6
silent (1)
    116:4
similarly (1)
    14:3
simply (1)
    51:15
single (2)
    55:18;65:5
single-lane (1)
    106:1
Sipek (2)
    111:4;112:17
sister (1)
    110:10
sit (2)
    45:12;113:7
sites (1)
    115:17
sitting (1)
    51:1
situation (11)
    29:2;75:13;78:16;
    79:18;80:1,17;85:17;
    89:13;103:12;104:17;
    111:16
six (4)
    9:18,18;72:5;91:11
sleep (4)
    59:3;61:14;72:7;86:19
sleeping (19)
    60:16,25;61:2,3,6,8,19;
    63:11;71:22;73:1;74:2,
    10,13,21;75:11;76:12;

slept (5)
    72:13,14,18,22;85:5
slightly (1)
    87:10
small (1)
    40:8
Smartphone (3)
    115:8,18,21
smoke (1)
    82:8
somebody (12)
    31:16;36:8;38:18;
    55:14;64:2;73:25,25;
    74:11;86:8;87:9,11;
    109:11
somebody's (2)
    75:16;91:3
someone (1)
    56:16
Sometime (3)
    65:20;69:18;74:17
sometimes (7)
    14:20;15:10;22:18;
    28:14,15;36:19;105:25
somewhat (1)
    78:25
son's (3)
    8:9;33:22,23
Sorry (5)
    61:16,17;78:21;
    110:16;112:17
sort (5)
    13:2;20:16;26:8;47:24;
    80:21
sorted (1)
    69:3
sought (1)
    80:10
sound (1)
    24:12
sounds (1)
    35:24
Spartan (1)
    9:4
speak (2)
    50:7;110:11
speaker (1)
    48:16
speaking (2)
    20:8;48:3
specific (4)
    29:8;49:6;61:20;70:9
specifically (5)
    28:2,17,20;45:5;90:12
spoke (4)
    46:21;108:21;109:13;
    110:3
stamped (1)
    33:12
standing (1)
    95:16
stands (1)

85:2,8,15
Start (5)
    13:10;62:19;67:4,6,6
started (9)
    16:18;42:3,4;58:7;
    62:9;65:24;68:20;98:22;
    115:20
state (1)
    4:8
stated (2)
    63:12;71:5
statement (4)
    37:3,5;70:24;98:18
statements (6)
    15:18,19;16:3,3,11,20
status (1)
    14:24
stay (3)
    12:20;77:15;99:2
stayed (2)
    12:19;96:12
staying (1)
    99:4
Step (1)
    96:6
step-mom (1)
    108:7
stepping (1)
    62:10
still (13)
    16:2;60:25;65:13;
    66;20,23;68:24;78:24;
    81:24;84:9;85:2,14;90:3;
    95:15
stirring (1)
    95:9
stop (2)
    74:13;79:7
stopped (9)
    16:5,20.21;42:5,8;
    74:18,21;79:5;84:14
straight (3)
    46:13;56:21;96:16
strain (5)
    59:9,11,17;60:15;80:21
stray (1)
    45:24
Street (2)
    7:10;22:9
stress (1)
    75:20
stressed (3)
    75:13,18;76:1
strike (12)
    12:8;28:15;37:11;
    48:18;64:6;71:13;82:11;
    83:3;85:7;104:7;115:6;
    116:21
stuff (18)
    10:17;16:24;17:25;
    24:2;30:20;45:21;56:12;
    57:15;59:4,9;63:18;
    75:11,17;88:6,13;94:12;

97:7;100:17
subjects (1)
    108:8
subpoenaed (1)
    39:10
summary (1)
    34:25
Sun (5)
    7:8,10;19:11,23;88:5
supplied (1)
    10:6
supplies (1)
    9:22
supply (1)
    9:16
supposed (3)
    45:6,8;89:24
supposedly (2)
    43:2;60:5
Sure (31)
    4:10;7:10;11:13;12:5;
    13:6;17:11,12,20:18:5;
    22:25;26:11;30:5;36:25;
    41:3,5;44:22;54:3;55:23;
    65:14;76:5,6;79:10;81:5;
    88:8;101:2,18;103:8.24;
    104:3;108:1;109:14
surprised (1)
    97:22
surrounding (1)
    104:16
sworn (1)
    4:2

T

tablet (3)
    34:8,12,17
tablets (1)
    34:8
talk (19)
    7:2;13:7;29:1;37:21;
    38:15;45:1;47:10;58:24;
    60:12;61:8;68:7;71:9;
    73:18,22;83:4;92:20;
    96:3;99:20;110:21
talked (8)
    20:5,13;38:8;55:3;
    73:25;106:12,18;114:24
talking (10)
    26:2,21;46:24;62:19;
    80:21;89:17;104:20;
    106:16;108:9;110:5
tap (1)
    83:22
tapped (3)
    84:24;85:21;87:13
tasks (1)
    81:24
tears (10)
    56:10,18;57:2,9;58:14;
    59:2;60:15;79:4;95:15,17
technical (1)

8:17
telephone (24)
    29:24;30:9,18;31:12;
    33:13,15;40:3;41:9;42:7;
    49:17;50:10,22;51:12,17,
    20;52:9;54:10;55:7;57:3;
    58:17;62:2;107:6;114:7;
    115:12
telephoned (1)
    41:23
tells (1)
    63:16
ten (3)
    8:2;56:22;116:23
testified (2)
    4:3;66:5
testimony (3)
    4:13;55:9;72:20
thinking (3)
    70:19;73:14;96:15
third (1)
    33:12
Thirty-nine (1)
    7:6
though (1)
    39:9
thought (2)
    62:7;92:24
thoughts (1)
    87:2
threat (1)
    105:15
three (9)
    9:1,4,8;11:18;30:2;
    41:4;69:22;71:24;72:10
times (22)
    16:23;33:4;46:3;54:9,
    13,21;56:10,18,19,20,21,
    22,25;57:1;58:15;62:13;
    65:2;66:15;68:17,17;
    83:5;95:16
titles (1)
    14:9
today (9)
    5:5,18,22,25;37:24;
    45:12;75:7;108:9;113:7
together (1)
    18:10
told (27)
    35:17;42:23;43:3;
    45:15;50:17;53:19,20;
    61:13;63:20;73:17,19,25;
    74:5,11;75:7;79:5;82:19;
    92:21;94:25;95:16;96:5,
    21;101:9,10;108:15;
    111:15,17
took (13)
    11:4;51:13;69:13;
    74:25;81:1,7;83:6,24;
    84:4,13;86:1;99:7,8
top (1)
    24:11
totally (1)

Heather Nelson vs.
Santander Consumer USA, Inc., et al.

100:25
touch (1)
  4:16
towards (2)
  15:11;43:1
Town (4)
  13:15;14:4;83:10;
  84:11
track (2)
  44:21;57:1
training (1)
  8:17
travel (3)
  12:8,12;62:7
treatment (1)
  81:11
tried (3)
  97:23;105:22;106:4
tries (2)
  57:12,14
trip (9)
  83:11;84:20;97:7;
  98:20;99:3,3,14,24;104:6
trouble (8)
  60:16,25;61:1,3,4,5,8,
  18
truck (52)
  13:22,24;14:1,19;
  15:16;40:16;41:2;43:16,
  17;58:3,5;59:5;63:15,21;
  65:16,25;70:4,8;79:3,3;
  83:4;84:4,13;86:15;
  87:17;90:1;91:17,18,23,
  24,25;92:3,5,6;93:13,22;
  95:14,18;96:6;98:6,6;
  100:10;101:4;102:13,19;
  103:9,22;104:8,17,24;
  105:25;107:22
trucks (4)
  13:8,19;86:23;91:19
true (2)
  94:21;115:18
true-true (1)
  115:21
trust (7)
  62:14,14,18;63:13;
  64:6,19;65:15
trusting (2)
  63:14;65:24
truthful (2)
  5:7,10
try (8)
  62:22;66:6,24;67:18;
  69:11;91:16;98:14;99:15
trying (13)
  6:20;40:9;43:6;65:18;
  66:13,18;75:22;88:10;
  89:18;97:6;98:25;99:16,
  25
tune (1)
  90:6
turn (1)
  33:11

TV (3)
  51:2;52:12;85:14
Twelve (1)
  8:2
twelve-year-old (1)
  8:5
twice (1)
  49:9
Two (7)
  7:25;8:25;9:8;41:4;
  59:13;63:9;99:10
type (4)
  21:2;33:5;37:4;115:22
typical (1)
  35:5
typically (3)
  14:17;27:19;34:19

U

unable (1)
  81:19
under (2)
  33:12;97:12
understood (2)
  4:25;87:25
unpaid (2)
  36:3;78:11
up (45)
  22:14;26:13;27:10,20,
  22;53:4;59:4;60:8;61:4;
  81:21;84:2,25;85:24;
  86:14,24;87:17;88:1,22;
  90:17;92:2,13,14,16,21;
  93:11,12,13,13,19;94:25;
  95:1,10,19,23;96:8,23;
  97:1,14,19;98:2,20,21;
  101:11;103:23;112:17
upset (10)
  54:23;56:14;59:4;60:8;
  62:17;80:22;81:17,18;
  94:14,17
up-to-date (1)
  60:7
use (17)
  10:2,6,7;12:7;13:14;
  14:18,19;24:25;25:1,6;
  29:23;32:5;37:9;54:2;
  82:5,10,21
used (7)
  25:4,11,13;30:4;82:23;
  100:5,6
uses (3)
  12:15;14:17;21:14
using (3)
  12:12;32:5;115:15
usually (1)
  92:15
utilities (1)
  36:2
Utility (3)
  20:16;22:7,8

V

vaca (1)
  104:5
vacation (1)
  104:6
van (16)
  14:3,18;15:16;40:16;
  41:2;43:17;70:6;99:7;
  105:2,6,11,19,23;106:5;
  107:12,20
vans (2)
  13:8,19
variances (1)
  56:6
varies (1)
  14:20
vehicle (3)
  12:15;13:8;93:15
vehicles (8)
  10:2,6,7;12:13;13:7,13,
  20;14:8
verbal (1)
  105:15
verbally (1)
  4:17
verify (1)
  51:17
verifying (1)
  51:19
Verizon (21)
  25:16,17,20;26:2,9;
  27:9,19;28:1,3,5,8,12;
  29:11;32:20;33:6;34:23;
  35:10;37:5,7;115:16,25
Verizon's (1)
  32:23
versus (1)
  104:1
via (3)
  18:8;22:23,24
Vicky (1)
  109:15
Village (6)
  11:6,7,9,15;12:17;13:4
Virginia (2)
  110:7,9
visit (1)
  12:17
visits (2)
  10:19;12:11
vocational (1)
  8:17
voice (10)
  47:1;48:19,23,25;49:1,
  3,7,11,17;90:24

W

Waddell (3)
  113:21,21;114:8
Wake (1)

84:24
walk (1)
  8:22
walked (1)
  95:19
Warehouse (1)
  9:11
Warren (1)
  108:4
watching (1)
  51:2
way (14)
  35:25;37:6;58:17;
  59:25;62:1;71:2;75:5;
  76:19;78:6,17;89:11,11;
  96:17;107:10
ways (2)
  58:21;106:13
Wednesday (1)
  6:11
week (3)
  60:20;66:12;100:22
weekend (16)
  83:13,15,20;98:14;
  100:21;102:20,25;104:4,
  25;105:5;106:20;107:7,
  14,15,21;114:9
weeks (7)
  60:23;63:9;65:3;66:12;
  69:24;71:24,24
wench (1)
  91:21
weren't (17)
  14:21,22;54:18;63:3,
  16;64:21;67:21;70:12;
  73:5,8;76:1,4,15;77:22;
  82:14;85:15;115:20
whatnot (1)
  22:21
What's (25)
  7:18;8:7;11:7;13:10;
  14:24;23:18,22;31:21;
  34:6;36:21;41:20;51:5;
  60:20;62:10,24;68:16;
  69:21;76:6;79:2;83:23;
  86:3;97:10,24;101:24;
  102:1
Wheelock (2)
  113:10,15
Whenever (1)
  54:1
whereabouts (1)
  38:24
whole (16)
  31:25;36:24;39:20;
  61:21,22;62:14;70:7;
  75:13,21,23;84:12;87:24;
  88:13;90:5,6;101:7
Who's (3)
  25:15;108:4;113:21
Whose (5)
  14:12;25:23,24,25;
  70:16

wife (56)
  10:10,25;12:7;13:1,14;
  15:5;17:12;20:5,8;23:20;
  25:21;29:13,23;37:23;
  40:5;41:24;42:10;49:7;
  54:7,10;56:18;58:11,14,
  18;64:13;65:25;66:11;
  67:23;71:14;73:8,15,17;
  75:6;77:11;78:21,21;
  79:18;80:10,23;81:18;
  82:5,8,10,12;85:9;89:16;
  94:13,14;99:10;106:14,
  18;107:5;109:25;110:3;
  116:15;117:2
wife's (3)
  7:18;25:11;35:5
window (5)
  79:1;84:1;95:12,13,24
windows (1)
  87:10
Wisconsin (11)
  7:8;11:16,25;12:22;
  13:4,6,6;112:16,19,20;
  116:17
within (1)
  77:15
witness (3)
  4:2;95:2;99:22
woke (2)
  85:22;88:1
woken (1)
  95:23
word (2)
  87:6,6
words (1)
  39:17
work (28)
  9:7,15;10:10,12;11:9;
  12:8,20,23,24;24:2;25:2,
  4,9;30:22,23;31:1;34:15;
  48:3;62:8;81:21;93:23;
  94:1;111:15,21,23;112:1,
  5,7
workday (1)
  68:7
worked (7)
  8:24;9:5,11,17;11:2,5;
  90:14
worker (1)
  112:18
working (1)
  11:24
work-provided (1)
  12:13
works (2)
  12:10;101:7
worried (2)
  59:6;94:11
write (3)
  44:16;45:20;46:3
writing (8)
  44:12,18,23;46:4;
  55:16,17,20,21

Heather Nelson  vs.
Santander Consumer USA, Inc., et al.

Deposition of RAYMOND NELSON
April 12, 2013

written (1)
  52:6
wrong (4)
  16:16;57:10,16;75:2
wrote (2)
  53:4;55:24

**Y**

year (5)
  8:13;9:18;11:4;42:16;
  83:16
years (21)
  7:12,14,21;9:1,4,8,12,
  18,19;11:12;13:2;30:2,2,
  13,14;41:4;55:1;103:4,7;
  114:18,18
yep (1)
  96:8
yesterday (1)
  6:8

**Z**

zero (1)
  68:13
zoo (1)
  84:12

**0**

0679 (1)
  32:9
0680 (1)
  32:9
0681 (1)
  33:12
0683 (1)
  32:11
0941 (1)
  37:1
0945 (1)
  37:1

**1**

1 (3)
  31:19,22;32:14
10 (3)
  83:8,17;99:1
10-'12 (1)
  65:19
11 (4)
  7:12,13;83:8,17
12:59 (1)
  117:15
14 (1)
  7:21
15 (1)
  116:23
156 (1)
  35:2
1992 (1)

8:14

**2**

2 (2)
  31:19;36:22
2004 (3)
  13:17,22,25
2005 (2)
  13:15;14:4
2007 (1)
  25:19
2008 (1)
  25:19
2010 (1)
  13:3

**3**

3 (2)
  84:7,7
300 (1)
  56:23

**4**

455 (1)
  35:2

**5**

516 (3)
  7:10;22:3,9

**6**

6 (1)
  84:7
60 (1)
  14:19
608-469-3331 (1)
  34:7
608-512-8192 (2)
  24:19,22
608-512-8374 (1)
  23:19
608-512-8375 (1)
  23:23
608-807-9359 (1)
  24:12

**7**

7 (2)
  84:7;96:19

**8**

8 (2)
  96:19;98:25
8192 (1)
  33:20
8374 (2)

33:15,19
8375 (1)
  33:23